FRITO-LAY, INC. *v.* PLANNING AND ZONING
COMMISSION OF THE TOWN OF KILLINGLY ET AL.
(13134)

HEALEY, CALLAHAN, GLASS, COVELLO and SANTANIELLO, Js.

Argued November 5, 1987—decision released March 15, 1988

*Ralph P. Dupont,* with whom was *Thomas J. Riley,*
for the appellant (plaintiff).

*John D. Boland,* for the appellee (named defendant).

*Gregory A. Sharp,* for the appellee (defendant
Richard C. Cunneen).

ARTHUR H. HEALEY, J. The plaintiff, Frito-Lay, Inc. (Frito-Lay), appealed to the Superior Court from the denial of its application for a special permit and site plan approval (application) by the named defendant, planning and zoning commission of the town of Killingly (commission).[1] Although that court found Frito-Lay to be aggrieved, it dismissed its appeal.[2] The Appellate Court granted Frito-Lay's petition for certification and, thereafter, this court transferred the appeal to itself. Practice Book § 4023.

Initially, certain relevant circumstances, augmented later in this opinion, are appropriately set out at this point. Frito-Lay is, and has been at all times relevant, the record owner of real estate in Killingly, upon which is situated a food processing facility and office. These premises are located in an industrial district as defined in the Killingly zoning regulations (regulations). After some discussions with Killingly town officials, Frito-Lay filed an application for a special permit on November 26, 1984, which was later supplemented by a site plan. This application explicitly proposed "new construction" of a wood chip burning electric "cogeneration plant" and this proposed facility included, inter alia, a boiler, generator, silo and chimney.[3]

---

[1] At the time of the hearing of Frito-Lay's appeal in the Superior Court, Richard C. Cunneen moved to be joined as a party defendant and his motion was granted. On March 26, 1985, at a special meeting of the commission, Cunneen, represented by Attorney Gregory Sharp, filed a verified notice of intervention with the commission and was permitted, over objection of Frito-Lay's counsel, to "intervene" and address the commission. See General Statutes § 22a-19 (a). On appeal, the defendant Cunneen has adopted the brief of the defendant commission.

[2] The memorandum of decision of the trial court, *Noren, J.,* dismissing the appeal, encompasses twenty-one pages in the record.

[3] At the time of this application, Frito-Lay's power needs were supplied by generating steam on its site. By its application, it sought to introduce a wood-fired system which, it claimed, would not only conserve energy resources but would also reduce costs by generating marketable surplus electricity. It maintained that its application would "actually result" in the removal of two existing stacks and the construction of one new "chimney" to serve a new boiler system.

The commission formally accepted Frito-Lay's application at its regular meeting of December 10, 1984. See General Statutes § 8-7d (c). Thereafter, a public hearing was set by the commission for January 14, 1985. This public hearing was duly noticed and held on January 14, 1985. At that hearing, the commission heard testimony, received other evidence and heard oral argument for and against the application. The chairman of the commission specifically declared the public hearing closed at the end of the meeting of January 14, 1985. At that time, Frito-Lay's application was tabled to the commission's next regular meeting on February 11, 1985, pending the receipt of certain information required by the commission.

At its regular meeting of February 11, 1985, the commission, during its "Citizens' Participation"[4] item on its agenda, heard comments on the Frito-Lay application.[5] The trial court found that "fourteen citizens voiced opinions during the course of the meeting on the plaintiff's application." A close examination of the transcript of the remarks made during the "Citizens' Participation" portion discloses that most of those speakers did not view the application with favor. Richard Cunneen, who later intervened and ultimately became a party defendant, was one of the citizens who spoke. After this portion of the meeting was over, commission chair-

---

[4] At that time, commission chairman Vincent Baiocchetti said: "All right, the next item on our agenda is Citizens' Participation. It is during this portion of the of the meeting that any taxpayer or resident of the Town of Killingly may speak on any issue regarding Planning and Zoning. It need not be on the agenda for tonight. As the size of the crowd here, I'm sure there are a few people that want to make comments. I'll ask you to hold your comments to a maximum of three minutes. This is not an opportunity for discussion, arguments, back and forth, it's for you to say what you have to say, that's essentially it. Please state your name, your address, raise your hand, I'll recognize you, we'll go from there. Yes, sir?"

[5] The trial court found that, at this meeting, commission member Paul Szelag disqualified himself on the Frito-Lay application and alternate member Peter Mann was appointed as his replacement.

man Vincent Baiocchetti addressed William Walker, Frito-Lay's plant engineer who was present, and told Walker that he had some questions to ask him.[6] Walker responded not only to the chairman's question, but also to a large number of questions from other members of the commission. At the end of this meeting, the commission voted unanimously to table the application until its next meeting on March 11, 1985.

At the outset of the meeting of March 11, 1985, the town planner, Richard Hubbard, announced that Frito-Lay would not be present that night due to a fatality at its plant and that Frito-Lay had requested an extension until the end of March. The commission determined that a special meeting would be held on March 26, 1985, and, therefore, that no action would be taken that night.[7] Thereafter, the "Citizens' Participation" portion of the agenda preceded the other business of the meeting, as it had on January 14, 1985, and on Febru-

---

[6] At that time, commission chairman Baiocchetti said to William Walker: "Mr. Walker, since you're the rep, and you're the man bearing the brunt of all this, there are some questions that I have, and it may answer some other questions, it may generate some others. In my business, I'm in a situation where I run into a lot of technical people, I asked a few questions of one person. Would it technically be feasible to take the plant exhaust, with the potato and hot oil odors, and use this air for boiler combustion air, as you can tell from what you've heard tonight and other nights, people aren't really opposed to this woodchip idea, what they're really opposed to is the smell, that's been coming, the smell and noise that's been coming since the plant began. That's really been generated, I think, most the aggravation that you're hearing from most of the people. Would it be possible to do this thing, I think it's my understanding that if you're able to do that, you would eliminate the odor completely, by burning it."

Later, during this portion, Baiocchetti said to Walker: "Ok. Now, you've heard the comments that were brought out this evening, are there any in particular that you would like to address, or that you've addressed already, I guess you've already addressed them, of course." Walker did respond with observations. Thereafter, there followed more questions from commission members and responses to them by Walker.

[7] The trial court found that, at this meeting, commission member Robert Gaudet disqualified himself and that alternate member William Weiner was appointed as his replacement.

ary 11, 1985. At the "Citizens' Participation" portion, nine persons spoke on the Frito-Lay matter.

On March 26, 1985, the commission held a special meeting.[8] At the outset of this meeting, Baiocchetti, before opening "Citizens' Participation," said that the commission was "limiting discussion based on the information that [had] been gathered at the public hearing, so any comments that the citizens want[ed] to make regarding Planning and Zoning *should not, should not* relate to the matter before us this evening."[9] (Emphasis in original.) This immediately met with a demurrer from a prospective speaker. She was told by the chairman that anything she said "relative to the issue before [the commission that night would] carry no weight because [the commission had] already taken testimony." This woman, however, did speak on the Frito-Lay matter. Attorney Gregory Sharp, representing Cunneen, also spoke, as did Cunneen himself. Despite further statements by the chairman that the commission could accept "no more testimony" because the hearing had been closed in January, that that hearing had been "irrevocably closed," that the commission was not taking "any evidence at this point" and that the commission was "following state statutes exactly," fourteen citizens still spoke on Frito-Lay's operations and the great majority was opposed to its operations. During the "Citizens' Participation" portion, counsel for

---

[8] This was noticed as a "special meeting" of the commission and the Frito-Lay application was the sole item noticed in the publication for the special meeting.

[9] Baiocchetti's entire opening remarks were: "Up to Citizens' Participation. At this time in the meeting, we open the meeting to citizens' participation relative to any matter regarding Planning and Zoning. I'd like to state that, we are limiting discussion based on the information that has been gathered at the public hearing, so any comments that the citizens want to make regarding Planning and Zoning *should not, should not* relate to the matter before us this evening. Ok, anyone have anything they'd like to bring up, Planning and Zoning?" (Emphasis in original.)

Frito-Lay, citing the opening statement of the chairman, objected to Sharp's proposal to speak, although he also said that he had no objection to members of the public speaking. After all of the members of the public had spoken, the chairman asked if anyone from Frito-Lay wished to make a comment.[10] Walker indicated that, given the chairman's earlier ruling, Frito-Lay had elected not to comment.

Immediately thereafter, the chairman closed "Citizens' Participation" and the commission itself discussed the Frito-Lay application. That same evening, the commission voted to deny the Frito-Lay application by a vote of three to two. The reasons given for its denial were: (1) the application did not meet the requirements of § 720.4 (c) and (e)[11] of the Killingly zoning regulations; and (2) "the surrounding community has lost faith in Frito-Lay, Inc., due to past performance . . . promises have been made to the community prior to the construction of the facility which were not

---

[10] At that time, Baiocchetti asked the following question and Walker of Frito-Lay replied as follows:

"[Mr. Baiocchetti]: Anyone else? Does anyone from Frito-Lay wish to make a comment? You're certainly entitled.

"[Mr. Walker]: Mr. Baiocchetti, in view of the ruling that you made, we elect not to make any comment at this time, thank you.

"[Mr. Baiocchetti]: Thank you, Mr. Walker. All right, hearing no more, I'm closing citizens' participation. Special Permit Application Number 85-326 of Frito-Lay, Incorporated; members of the Commission, uh all right . . . ."

[11] Section 720.4 (c) and (e) of the Killingly zoning regulations provide:

"720.4 REVIEW OF SITE AND ARCHITECTURAL PLANS. The Commission shall review all plans in order to determine that the proposed use or the proposed extension or alteration of an existing use is in accord with the public health, safety and welfare after taking into account, where appropriate . . . .

"c. The nature of the surrounding area and the extent to which the proposed use or feature will be in harmony with the surrounding area or will serve as a transition between unlike areas and will protect property values and preserve and enhance the beauty of the area. . . .

"e. The avoidance of potential nuisance."

kept, which resulted in a loss of confidence in Frito-Lay's ability to do what it says it will do." Frito-Lay thereafter appealed to the Superior Court.

At the hearing[12] on the appeal before the Superior Court, Frito-Lay claimed that the commission: (1) either failed to act within the statutory time frame or conducted multiple public hearings, which it claimed invalidated any purported commission action, thus resulting in the automatic approval of its application pursuant to General Statutes §§ 8-3c[13] and 8-7d;[14] (2) acted improp-

---

[12] No evidence was taken in the Superior Court as it was conceded that Frito-Lay was aggrieved.

[13] General Statutes § 8-3c provides: "SPECIAL PERMITS AND EXCEPTIONS. HEARINGS. FILING REQUIREMENTS. The zoning commission or combined planning and zoning commission of any municipality shall hold a public hearing on an application or request for a special permit or special exception, as provided in section 8-2. Notice of the time and place of such hearing shall be published in a newspaper having a substantial circulation in such municipality at least twice, at intervals of not less than two days, the first not more than fifteen days, nor less than ten days, and the last not less than two days before the date of such hearing. At such hearing any party may appear in person and may be represented by agent or by attorney. Such commission shall decide upon such application or request within the period of time permitted under section 8-7d. Whenever a commission grants or denies a special permit or special exception, it shall state upon its records the reason for its decision. Notice of the decision of the commission shall be published in a newspaper having a substantial circulation in the municipality and addressed by certified mail to the person who requested or applied for a special permit or special exception, by its secretary or clerk, under his signature in any written, printed, typewritten or stamped form, within fifteen days after such decision has been rendered. Such permit or exception, shall become effective upon the filing of a copy thereof (1) in the office of the town, city or borough clerk, as the case may be, but, in the case of a district, in the offices of both the district clerk and the town clerk of the town in which such district is located and (2) in the land records of the town in which the affected premises are located, in accordance with the provisions of section 8-3d."

[14] General Statutes § 8-7d provides: "HEARINGS AND DECISIONS. TIME LIMITS. DAY OF RECEIPT. (a) Except as provided in subsection (b) of this section, in all matters wherein a formal petition, application, request or appeal must be submitted to a zoning commission, planning and zoning commission or zoning board of appeals under this chapter and a hearing is required on such petition, application, request or appeal, such hearing shall

erly from the outset in requiring an application for a special permit; and (3) acted illegally, arbitrarily or in abuse of its discretion in that the grounds assigned for its denial were not reasonably supported by the record. The Superior Court rejected all of these claims.

On appeal to this court, Frito-Lay claims essentially that the trial court erred: (1) because it did not conclude that the commission failed to complete the public hearing and lawfully decide its application within the mandatory time limits set out in § 8-7d (a), therefore requiring that its application be approved as a matter of law; and (2) in concluding that the commission had the authority to ignore its own regulations to require it to obtain a special permit pursuant to § 770

commence within sixty-five days after receipt of such petition, application, request or appeal and shall be completed within thirty days after such hearing commences. All decisions on such matters shall be rendered within sixty-five days after completion of such hearing. The petitioner or applicant may consent to one or more extensions of any period specified in this subsection, provided the total extension of any such period shall not be for longer than the original period as specified in this subsection, or may withdraw such petition, application, request or appeal.

"(b) Whenever the approval of a site plan is the only requirement to be met or remaining to be met under the zoning regulations for a proposed building, use or structure, a decision on an application for approval of such site plan shall be rendered within sixty-five days after receipt of such site plan. The applicant may consent to one or more extensions of such period, provided the total period of any such extension or extensions shall not exceed two further sixty-five-day periods, or may withdraw such plan.

"(c) For purposes of subsection (a) or (b) of this section, the day of receipt of a petition, application, request or appeal shall be the day of the next regularly scheduled meeting of such commission or board, immediately following the day of submission to such board or commission or its agent of such petition, application, request or appeal or thirty-five days after such submission, whichever is sooner. If the commission or board does not maintain an office with regular office hours, the office of the clerk of the municipality shall act as the agent of such commission or board for the receipt of any petition, application, request or appeal.

"(d) The provisions of subsection (a) of this section shall not apply to any action initiated by any zoning or planning and zoning commission regarding adoption or change of any zoning regulation or boundary."

of its zoning regulations. Frito-Lay raises a number of subissues under each of these overall claims.

We turn first to the issues encompassed by Frito-Lay's claim that its application must be granted as a matter of law because of the commission's failure to adhere to the mandatory time limits set out in § 8-7d (a). We do not agree.

Frito-Lay first argues that *Carr* v. *Woolwich,* 7 Conn. App. 684, 510 A.2d 1358, cert. denied, 201 Conn. 804, 513 A.2d 698 (1986), "directly controls" this case because this case involves an application for a special permit and site plan approval on which a hearing is required. It argues that *Carr* held, in effect, that both the thirty day and sixty-five day time limits referred to in § 8-7d (a) are mandatory and that a failure to comply with either or both of these limits requires, as a matter of law, that its application be approved.

*Carr,* which was a mandamus action, "involve[d] the issue of whether the failure of the defendant [Bridgewater] planning and zoning commission to act upon the plaintiff's application for a zoning permit for a permitted use of his property within the time constraints set by General Statutes § 8-7d results in the automatic approval of the application." *Carr* v. *Woolwich,* supra, 684–85. *Carr* is factually distinguishable from this case. In *Carr,* the applicant filed his application with the commission on October 11, 1983, which "considered" it at its regularly scheduled meeting of December 7, 1983, and then voted to return the plaintiff's application and accompanying documents to him. On January 4, 1984, the plaintiff appealed to the board of zoning appeals, claiming the action of the commission in returning his application was improper. On March 19, 1984, that board directed the commission to process the application and site development plan. On April 14, 1984, at its regularly scheduled meeting, the commission noted

its receipt of the board's decision. It, nevertheless, "failed to take any further action" on the application and had not even done so for almost two years when, on March 14, 1986, the case was argued in the Appellate Court. In *Carr,* the Appellate Court affirmed the trial court's issuance of a mandamus to compel the commission to issue a certificate of approval to the plaintiff. While *Carr* is useful on the sixty-five day time issue because of its holding that the commission specifically failed to decide the matter within that mandatory limit of § 8-7d, the *Carr* court was not presented, for decision, with a factual circumstance concerning the thirty day time limit of that statute. Moreover, there is no indication in *Carr* that the hearing required by statute, triggering the thirty day limit, was ever noticed and scheduled as it was in this case. *Carr* does not "control" this case.

The trial court found that Frito-Lay, by requesting the extension on March 11, 1985, waived the sixty-five day time limit under the statute, thereby rendering it impossible for the commission to act within that sixty-five day period. There is no question that more than sixty-five days had elapsed from January 14, 1985, to March 26, 1985, when the commission rendered its decision. Having requested this continuance beyond what would have been sixty-five days from January 14, 1985, Frito-Lay has no complaint about extending the sixty-five day limit. Although the record does not indicate that Frito-Lay was represented by counsel[15] until March 26, 1985, as a corporate entity, it was, as much as any individual, chargeable with knowledge of the law. *M & L Homes, Inc.* v. *Zoning & Planning Commission,* 187 Conn. 232, 244–45, 445 A.2d 591 (1982). Frito-Lay's action in obtaining the extension to March 26,

---

[15] At oral argument, Frito-Lay's counsel, who also represented Frito-Lay at the March 26, 1985 hearing and in the trial court, indicated that he was not retained as counsel until March 25, 1985.

1985, was a valid waiver of its right to require the defendant commission to make its decision under the statute within sixty-five days after the completion of the hearing of January 14, 1985. See General Statutes §§ 8-7d, 8-3c.

Ordinarily, this fact pattern, with the time for decision properly extended beyond the mandatory sixty-five day limit at the request of the applicant, would settle this phase of the matter. Frito-Lay, however, also contends that, the commission's disregard of the mandatory hearing procedures made the commission's March 26 vote, after the illegal proceedings of February 11, 1985, March 11, 1985, and March 26, 1985, a nullity. This alleged illegality of continuing to hold hearings after the close of the public hearing on January 14, 1985, it asserts, so tainted the proceedings that it resulted in the inability of the commission ever to render a valid decision within the sixty-five day limit. Thus, it maintains that its consent on March 11, 1985, to extend the time limit does not end this issue, but rather, under the circumstances, requires the automatic granting of its application.

Frito-Lay's claim requires that we examine, as the trial court did, the hearings of February 11, 1985, March 11, 1985, and March 26, 1985, to determine their legal significance in this context. The trial court expressly noted that "Frito-Lay's only credible complaint of untimely action by the Commission [was] the alleged failure to comply with the thirty day limitation of Sec. 8-7d that the 'hearing shall be completed within thirty days after such hearing commences.' " (Emphasis omitted.) In rejecting Frito-Lay's claim that the post-January 14 "meetings" constituted separate hearings on its application, the court noted that Frito-Lay had cited *Gervasi* v. *Town Plan & Zoning Commission,* 184 Conn. 450, 453, 440 A.2d 163 (1981), "for the proposition [that] the zoning statutes do 'not authorize

multiple public hearings in connection with a single
. . . proposal.' "[16] The court went on to point out that
for it "to conclude multiple public hearings occurred,
it must find the Commission improperly received evi-
dence, deprived the applicant of opportunity to rebut
such evidence and, in doing so, prejudiced the appli-
cant." The trial court's review of the record revealed
that there was "lengthy discussion, termed citizens'
participation, which occurred more than thirty days
after January 14, 1985," the substance of which "con-
sisted primarily of discussion of Frito-Lay's existing
operations and was not addressed to the merits of the
application or the site plan" and "[t]o this extent receipt
of such information [could not] be found to be prejudi-
cial, since the Commission members may legitimately
utilize their personal knowledge in reaching a decision."
In any event, the trial court went on to say, "much if
not all, of what was said concerning Frito-Lay's exist-
ing operations [was] common knowledge within . . .
Killingly, as well as immaterial to the application." It
opined, however, that "[t]o the extent argument was
addressed to the merits of the application, it merely
supplemented the plethora of technical studies and
reports properly before the Commission, or was merely
cumulative, and [could not] be found to be prejudicial."
Moreover, if it was improper for the commission "to
hear from opponents" of this application, the trial court
pointed out that it "must have been equally improper
for the plaintiff to present favorable information."
Rather than refraining from submitting evidence more
than thirty days after January 14, 1985, as the plain-

[16] At this point, the trial court noted that Frito-Lay's proposal was tabled
at each subsequent meeting of the commission "and it is thus not clear that
'multiple' hearings were conducted." It also pointed out that Frito-Lay's
argument appears to "ignore the implications of [footnote] 2 of [*Gervasi*
v. *Town Plan & Zoning Commission*, 184 Conn. 450, 440 A.2d 163] (1981)
at page 454 as to what constitutes a 'hearing.' Clearly [the trial court said]
there was but one 'submission' here."

tiff claimed, the trial court said that Frito-Lay submitted evidence to the commission as late as March 26, 1985.[17] The trial court finally concluded that "considering any procedural irregularity attributable to the Commission in the light of [Frito-Lay's] request for an extension of time and in light of the materials submitted to the Commission by [Frito-Lay] after the completion of the January 14 hearing, it cannot be found that [Frito-Lay] was sufficiently prejudiced so as to taint the proceedings and invalidate the action of the Commission."

On the other hand, Frito-Lay maintains that the trial court's findings of fact support its claim that the commission did conduct multiple public hearings or, at the very least, despite its vote to close the hearing on January 14, 1985, continued the initial hearing well beyond the thirty day limit mandated for its conclusion by General Statutes § 8-7d (a). It argues that the commission repeatedly took testimony, received evidence and heard oral arguments at its meetings of February 11, March 11 and March 26 and that these constituted "hearings" under such cases as *Gervasi* v. *Town Plan & Zoning Commission,* supra, *Rybinski* v. *State Employees' Retirement Commission,* 173 Conn. 462, 469–70, 378 A.2d 547 (1977), and *Shaw* v. *Planning Commission,* 5 Conn. App. 520, 524–25, 500 A.2d 338 (1985). Asserting that it did not expressly or impliedly consent to any hearing after January 14, 1985, Frito-Lay maintains that the trial court itself, in its memorandum of decision, relied heavily on "testimony" and "contradicting evidence" presented at the meeting of March 11 to support the only valid reason given by the commission to support its denial. This meeting, Frito-Lay

---

[17] Here, the trial court specifically referred to one item which was a letter submitted by David Kovey, a Frito-Lay official in Killingly, to Richard Hubbard, the Killingly town planner, stamped received by the Killingly planning and zoning commission on March 25, 1985.

stresses, was one at which it had no representation. In addition, it argues that it is not required to show that prejudice resulted to it because of the commission's failure to obey the mandatory time limits of § 8-7d (a). It further contends that these violations are not cured by the commission chairman's comments at the meeting of March 26 that the testimony given there would not be considered nor by Frito-Lay's submission "to the Commission and its technical consultants of data and other information requested."

There is no dispute that the commission properly noticed and held a public hearing on the Frito-Lay application on January 14, 1985, and that, at the end of that hearing, the chairman declared the public hearing closed. See General Statutes §§ 8-3c, 8-7d. It is fair to say that " '[t]he very purpose of [that] hearing was to afford an opportunity to interested parties to make known their views and to enable the board to be guided by them. It is implicit in such a procedure that changes in the original proposal may ensue as a result of the views expressed at the hearing. *Couch* v. *Zoning Commission,* 141 Conn. 349, 358, 106 A.2d 173 [1954] . . . .' *Neuger* v. *Zoning Board,* [145 Conn. 625, 630, 145 A.2d 738 (1958)]." *Kleinsmith* v. *Planning & Zoning Commission,* 157 Conn. 303, 311, 254 A.2d 486 (1968). That hearing could properly have been continued and "completed within thirty days after [it] commence[d]," but it was not. We, therefore, must consider the legal effect of the "hearings" of February 11, March 11 and March 26. We said in *Rybinski* v. *State Employees' Retirement Commission,* supra, that "[a] hearing can be a proceeding in the nature of a trial with the presentation of evidence, it can be merely for the purpose of presenting arguments, or . . . it can be a combination of the two. . . . Not only does a hearing connote an adversarial setting, but usually it can be said that it is 'any *oral* proceeding before a tribu-

nal.' . . . Our cases consistently recognize the generally adversarial nature of a proceeding considered a 'hearing,' in which witnesses are heard and testimony is taken. See, e.g. . . . *Armstrong* v. *Zoning Board of Appeals,* 158 Conn. 163, 257 A.2d 799 [1969] (public hearing, zoning commission heard evidence and arguments); *Kleinsmith* v. *Planning & Zoning Commission,* [supra] (hearing to permit interested persons 'to express their views')." (Emphasis in original.) See also *Gervasi* v. *Town Plan & Zoning Commission,* supra; *Colonial Trust Co.* v. *Austin,* 133 Conn. 696, 699, 54 A.2d 503 (1947). Applying proper principles to the record before us, what occurred on February 11, March 11 and March 26 were "hearings" on the Frito-Lay application, albeit without any sanction in the enabling zoning statutory scheme. After the hearing of January 14, 1985, was held and closed on that date, there could be no further "hearings" on Frito-Lay's application that would be permitted under the enabling statutory scheme on zoning. Cities, towns and the like have no inherent police power; zoning is an exercise of police power, and cities and towns must operate in zoning matters within the enabling statutory scheme. *Florentine* v. *Darien,* 142 Conn. 415, 422, 115 A.2d 328 (1955); *Strain* v. *Mims,* 123 Conn. 275, 285, 193 A. 754 (1937); 8 E. McQuillin, Municipal Corporations (3d Ed. Rev.) § 24.35.

Even extending fair deference to the trial court's observation, which, like this court, did not hear testimony or take any evidence, we go on to examine its determination of the effect of what occurred at the post-January 14 hearings especially as to the lengthy "Citizens' Participation." We must look at the trial court's determination that such participation was primarily discussion of Frito-Lay's existing functions and was not addressed to the merits of the application. In addition, we examine the trial court's statement that even if they

did address the merits, they merely supplemented the plethora of technical studies and reports properly before the commission or were merely cumulative. First, neither the trial court nor the defendants point to any statutory or other legal basis for allowing the "Citizens' Participation" phase of any of these three meetings on the Frito-Lay application,[18] once the hearing of January 14, 1985, which was the time and place for such participation, was closed. There is no such basis, and such "Citizens' Participation" constituted a "hearing" on each occasion. Such participation prominently articulated concerns about the noise, odor, traffic problems and the lack of Frito-Lay's credibility, all matters that, in practical terms, addressed Frito-Lay's current application on the merits.

On March 26, 1985, an attorney for a resident "intervened," argued against granting the application, and

---

[18] Apparently, the trial court was of this view. The following took place at the trial:

"The Court: Excuse me. Can, under the regulations and our law, even though there's been an extension of time to March 26th, the commission legitimately take testimony, hear evidence in the interim? It can't, can it? Isn't that where you start, first of all?

"Mr. Sharp: The statute—

"The Court: Before you—

"Mr. Sharp: The statute—

"The Court: If they did it, then you go on to weigh prejudice, you are saying?

"Mr. Sharp: That's right.

"The Court: But, legitimately, they can't do that; isn't that correct?

"Mr. Sharp: I would agree with that, your Honor. The difficulty that we get into is the way the statute is phrased. It talks about completing the public hearing within 30 days.

"Now, the public hearing, there are very specific requirements for a public hearing in terms of notice and so on and so forth. To the extent that the commission held a public hearing, as all the parties have agreed, a public hearing was held on January 14 and was adjourned on January 14. Now, what happened after that is in the record. Killingly has a provision where they allow citizens to speak on any number of issues.

"The Court: Not sanctioned by any statute.

"Mr. Sharp: Not sanctioned by any statute. And not prohibited by any statute."

introduced a photo of the Frito-Lay plant as an exhibit. The trial court observed correctly that commission members may legitimately utilize their personal knowledge in reaching a decision. See, e.g., *Burnham* v. *Planning & Zoning Commission*, 189 Conn. 261, 267, 455 A.2d 339 (1983). That, however, is not an acceptable explanation for the trial court's determination that "much, if not all," that was said about Frito-Lay's "existing operations" was common knowledge within Killingly, "as well as immaterial to the application." It was hardly "immaterial," especially given the second ground for denying the application, i.e., the community had lost faith in Frito-Lay "due to past performances," its "failure" to keep promises it made before its existing facility was constructed and the resulting loss of confidence in its ability "to do what it says it will do." Even assuming that much of this was common knowledge, these comments were made at hearings not authorized by law.

The defendants' countering arguments are also not persuasive. Following the trial court's reasoning, they argue that if it was "improper" for the commission to hear from "opponents" of the application, it must have been equally improper for Frito-Lay to present favorable information, which the trial court said that it did, as late as March 26, 1985. They argue that Frito-Lay should be estopped from complaining of new material coming before the commission, pointing first to the minutes of the meeting of February 11, which, it is claimed, consist "almost entirely" of a discussion between Frito-Lay's representative, Walker, and the commission. Reference to those minutes shows that initially fourteen citizens spoke under the "Citizens' Participation" section. Immediately thereafter, the chairman indicated that he had some questions to ask Walker, who did speak at some length in response to the chairman's questions as well as questions from other members of

the commission. Reference to those minutes also indicates that these questions and answers dealt in the main with technical matters clearly tied in with the general complaints of the citizens. This is not Frito-Lay's "opening the door," as the defendants argue, but rather is Frito-Lay's walking through the door that had been already opened. Where a commission is composed of laymen, we recognize that it is entitled to professional technical assistance in carrying out its responsibilities. *McCrann* v. *Town Plan & Zoning Commission,* 161 Conn. 65, 77, 282 A.2d 900 (1971); *Yurdin* v. *Town Plan & Zoning Commission,* 145 Conn. 416, 421, 143 A.2d 639, cert. denied, 358 U.S. 894, 79 S. Ct. 155, 3 L. Ed. 2d 121 (1958).

On March 11, 1985, nine citizens spoke to the Frito-Lay matter during the "Citizens' Participation" portion of the meeting. No Frito-Lay representative attended that meeting because of an accident that had occurred at the plant that day. The trial court's memorandum of decision quotes at length from what it characterizes as the "testimony" of the defendant Cunneen himself given at this meeting about his conversations with "several areas of New England and New York State that have wood-burning facilities" and noted problems that they were having with such facilities. The trial court then observed that "[Cunneen's] testimony was echoed by other concerned residents." What occurred constituted a "hearing," again with no legal sanction.

On March 26, 1985, another "hearing," again without statutory sanction, took place on the Frito-Lay application. Not only did fourteen persons speak to it under the "Citizens' Participation" portion of that meeting, but that included, certainly for practical purposes, the intervention into the proceedings of an attorney representing Cunneen, who spoke, over the objection of Frito-Lay's counsel, against the application and introduced an exhibit. We have already referred to the

efforts of the chairman from the outset of that meeting, who, having consulted with the commission's counsel who was present, stated that the commission could not consider what would be said by speakers that night.

We do not agree with the defendants' argument that, at the March 26, 1985 hearing, Frito-Lay waived its right to object to any of the citizens' comments because its counsel listened without objection while "citizens made their point about the [Frito-Lay] facility," but only objected when Attorney Sharp began to speak. This is so for two reasons. First, Frito-Lay was entitled to rely on the chairman's statements that such remarks would and could not be considered by the commission. In this connection, we should state that, despite the multiple hearings after January 14, 1985, the entire record would support the view that the commission had maintained an open mind without having made any prejudgment on the Frito-Lay matter. See *Daviau* v. *Planning Commission,* 174 Conn. 354, 358, 387 A.2d 562 (1978); *Pecora* v. *Zoning Commission,* 145 Conn. 435, 444, 144 A.2d 48 (1958). Second, Frito-Lay fairly viewed this as a "hearing" beyond the thirty day limit and this was consistent with its position that its consent went only to the extension of the sixty-five day limit for decision and not to any new hearing. We also do not agree with the defendants' contention that Frito-Lay waived its opportunity to rebut "any new submissions" at the March 26, 1985 meeting. At that time, after all the speakers had concluded, the commission chairman asked Walker if he wished to respond. Walker, with counsel present, declined to do so. Here again, Frito-Lay was entitled to rely on the chairman's statements that what had occurred would and could not be considered.

"The trial court may not substitute its judgment for the wide and liberal discretion vested in the local authority when acting within its prescribed legislative

powers. *Farrington* v. *Zoning Board of Appeals,* 177 Conn. 186, 190, 413 A.2d 817 (1979); *Summ* v. *Zoning Commission,* 150 Conn. 79, 89, 186 A.2d 160 (1962). The court must invest such broad discretion in these authorities when determining the public need and the manner of meeting it, because they are closest to the circumstances and conditions which 'create the problem and shape the solution.' *Stiles* v. *Town Council,* 159 Conn. 212, 219, 268 A.2d 395 (1970). Thus, the court may grant relief on appeal only where the local authority has acted illegally or arbitrarily or has abused its discretion. *McCrann* v. *Town Plan & Zoning Commission,* [supra, 74]." *Raybestos-Manhattan, Inc.* v. *Planning & Zoning Commission,* 186 Conn. 466, 469–70, 442 A.2d 65 (1982). Accordingly, we are fully aware that, in determining claims of error in such matters, "[c]ourts must be scrupulous not to hamper the legitimate activities of civic administrative boards by indulging in a microscopic search for technical infirmities in their action." *Silver Lane Pickle Co.* v. *Zoning Board of Appeals,* 143 Conn. 316, 319, 122 A.2d 218 (1956); *Couch* v. *Zoning Commission,* supra. We cannot, however, agree with the trial court's characterization of the multiple hearing claim as a "procedural irregularity" under the circumstances. Moreover, the commission itself, having triggered these "hearings" after January 14, 1985, in violation of "its prescribed legislative powers," cannot claim, as the trial court agreed it could,[19] that the plaintiff was not really prejudiced. Any such claim has no merit in this case.

Although "[t]here is a strong presumption of regularity in the proceedings of a public body such as a

[19] The trial court determined that "considering any procedural irregularity attributable to the Commission in light of the plaintiff's request for an extension of time and in light of the materials submitted to the Commission by the plaintiff after the completion of the January 14 hearing, it cannot be found that the plaintiff was *sufficiently prejudiced* so as to taint the proceedings and invalidate the action of the Commission." (Emphasis added.)

municipal planning and zoning commission"; *Murach* v. *Planning & Zoning Commission*, 196 Conn. 192, 205, 491 A.2d 1058 (1985); that presumption has plainly been rebutted here as the commission, in conducting multiple hearings, did not "[act] within [its] prescribed legislative powers." *Burnham* v. *Planning & Zoning Commission*, supra, 266.

Having held that the post-January 14, 1985 hearings were illegal, we turn now to the relief requested by the plaintiff. Despite these statutory violations, the commission did render its decision within the sixty-five day statutory time limitation which started from January 14, 1985, and which had been properly extended. General Statutes §§ 8-3c, 8-7d; cf. *Shapero* v. *Zoning Board*, 192 Conn. 367, 370, 472 A.2d 345 (1984); *Vartuli* v. *Sotire*, 192 Conn. 353, 363–64, 472 A.2d 336 (1984). We do not believe that the automatic approval of an application, which we have said was mandated in such a case as *Vartuli*, where the zoning authority did not render its decision within the sixty-five day limitation, is also mandated in this case because of the failure to observe the thirty day limitation. "A statute should be interpreted according to the policy which the legislation seeks to serve." *Aaron* v. *Conservation Commission*, 183 Conn. 532, 538, 441 A.2d 30 (1981); see 2A J. Sutherland, Statutory Construction (4th Ed.) §§ 56.01 through 56.02. Section 8-7d requires "*a* hearing" and that "such hearing . . . shall be completed within thirty days after such hearing commences . . . ." (Emphasis added.) Section 8-3c provides that "[s]uch commission shall *decide* upon such application . . . within the period of time permitted under section 8-7d [the sixty-five day limitation] . . . ." (Emphasis added.) Moreover, § 8-7d provides: "All *decisions* on such matters shall be rendered within sixty-five days after completion of such hearing." (Emphasis added.) There is no dispute at all that the commission properly

advertised and held "a public hearing"; see General Statutes § 8-3c; on January 14, 1985, and that it was formally closed on that date. At that time, the "hearing" requirement imposed by statute and the commendable policy of holding "a public hearing" for providing a public forum for citizen input had been satisfied. The commission, however, went further and held additional hearings after January 14, 1985. We do not read this statutory departure by the commission as requiring automatic approval as that does not present the need that this applicant, unlike those relying upon the sixty-five day limitation, "know with certainty that a definite course of statutory action has been taken by a commission, setting in motion clear avenues of appeal." *Carpenter* v. *Planning & Zoning Commission,* 176 Conn. 581, 597, 409 A.2d 1029 (1979), quoted in *Merlo* v. *Planning & Zoning Commission,* 196 Conn. 676, 684, 495 A.2d 268 (1985). In addition, we do not believe that the legislature intended automatic approval of the scenario presented to us. Given this view, we have determined that because the commission did act illegally, we should go no further than to sustain Frito-Lay's appeal and remand this entire matter to the commission for a new hearing in accordance with law. See *Thorne* v. *Zoning Commission,* 178 Conn. 198, 206, 423 A.2d 861 (1979); *Bogue* v. *Zoning Board of Appeals,* 165 Conn. 749, 753–54, 345 A.2d 9 (1974); see 4 R. Anderson, American Law of Zoning (3d Ed.) § 27.39, p. 601.

With this, we discuss briefly our action concerning the grounds that the commission cited as the basis for its decision of denial. Of the two grounds given, both defendants conceded, as the trial court found, that the second ground of denial "wherein the Commission alludes to broken promises and a loss of faith [in Frito-Lay], is insufficient under the law or the regulations." That leaves one ground for its denial: that Frito-Lay's application does not meet the requirements of § 720.4 (c)

and (e) of the Killingly zoning regulations. Our law is that the action of the commission should be sustained if even one of the stated reasons is sufficient to support it. See, e.g., *Burnham* v. *Planning & Zoning Commission,* supra, 265; *Goldberg* v. *Zoning Commission,* 173 Conn. 23, 25–26, 376 A.2d 385 (1977). This we would be required to do, assuming we were to find support for this remaining ground, had we not already determined the antecedent illegality of the multiple hearings for which the commission bears most, if not all, of the responsibility. "The over-all actions of the zoning commission must conform to the mandates of the statute," no matter how fairly and even-handedly the commission may have conducted themselves during all of the hearings. *Pecora* v. *Zoning Commission,* supra, 440. It follows that even were we inclined to the view, as the trial court was, that the one remaining reason was sufficient to support the commission's decision, that would mean that we would have to overlook and countenance the antecedent failure to comply with the zoning statute. Moreover, appellate review of the sufficiency of any stated reason in these matters does not exist in a vacuum. Such sufficiency is hardly severable in the sense of being separate and distinct from all of the earlier proceedings. It is readily apparent that the trial court's memorandum, having decided that there had not been multiple hearings, relied, in no small measure, on input from residents. This is proper so long as that input was at a hearing permitted by the zoning statute. The public hearing of January 14, 1985, was that legal public forum. An examination of the trial court's memorandum reveals that the trial court considered such input given at subsequent "hearings." For example, it quotes at length Cunneen's remarks at the March 11, 1985 proceedings whose "testimony," it points out, "was echoed by other residents."

While we express no opinion of the validity of this sole remaining ground of denial, we have referred to

it because inherent in it is Frito-Lay's claim that the commission should never have required it to apply for a special permit in 1984. Frito-Lay argues that its plant engineer sought a special permit "because he understood one was required." The record demonstrates that Frito-Lay had made inquiries of the Killingly town officials as early as October, 1984, concerning their "proposed wood-fueled co-generation plant" and were informed of the chronology of steps that it must take, including the filing of a special permit application to that end. Frito-Lay did so and raised no complaint about having to do so until it reached the trial court. In any event, Frito-Lay argues that it had been awarded an approved special permit in 1978 when it had constructed its present facility, that what it seeks to do now does not require a special permit because it is exempt under § 450.3[20] of the regulations and, therefore, the commission is ignoring, without any authority, its own regulations when it requires Frito-Lay to obtain a special permit under § 770[21] of the regulations.

We address this only because of the "jurisdictional" or "authority" tag that Frito-Lay seems to attach to this argument so that it will be clear at the new hearing on remand that the commission has the power to require Frito-Lay to apply for a special permit. We hold that the commission is so authorized. The trial court's

[20] Section 450.3 of the Killingly zoning regulations provides: "Height. No structure shall exceed the maximum height as specified in Table A, except that such regulations shall not apply to spires, belfries, cupolas, flagpoles, television aerials, water tanks, ventilators, farm silos, elevator penthouses, chimneys or other appurtenances usually required to be above the roof level and not intended for human occupancy provided such structures are incidental to a permitted use located on the same property."

[21] Section 770 of the Killingly zoning regulations, entitled "Revisions and Extensions," provides: "Any substantial revision of an approved special permit application and any reconstruction, enlargement, extension, moving or structural alteration of an approved special permit use or any building or structure in connection therewith shall require submission of a special permit application as for the original application."

opinion aptly stated sufficient authority when it said: "The issue, therefore, is whether a co-generation plant intended to house a wood storage silo, wood hog, solid fuel boiler and turbine operator is a mere appurtenance usually required to be above roof level and incidental to a permitted use or a structural alteration of an approved special permit use. Given that the proposed construction of the facility is anticipated to be at least eight months, and contemplates the installation of a boiler, generator, wood hog and silo, it would seem reasonable to conclude that the proposal was either a substantial revision or structural alteration. Consequently, Sec. 450.3 need not be construed so as to exempt the proposed construction from the requirements imposed by Sec. 770 of the Regulations." We also note that on the application Frito-Lay filed in this case under "Proposed Activity" the line designated "New Construction," and not the lines designated "Addition" or "Alteration," is checked. It also wrote under "Proposed Activity" the words "Cogeneration Plant."

Under all the circumstances, justice and fairness require that Frito-Lay's application, together with the site plan, be remanded to the Killingly planning and zoning commission for a new hearing and proceedings according to law.

There is error, the judgment dismissing the appeal is set aside and the case is remanded for further proceedings not inconsistent with this opinion.

In this opinion the other justices concurred.