[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff, Gateway Park Associates [the "plaintiff" or "Gateway"], appeals the decision of the defendant Greenwich Planning and Zoning Commission [the "Commission"] granting the application of PIC Associates, owner, and Robert Testa and John Farrell, tenants [the "applicants"] for a zone change, a special permit and site plan approval.
PIC Associates [PIC] is the owner of property located at the northwesterly corner of Homestead Lane and West Putnam Avenue in Greenwich, Connecticut, consisting of 1.229 acres and known as Lots 468 through 475 and part of 476, Homestead Lane. The property is or will be leased to Robert Testa and John Farrell. By application dated February 9, 1989, the applicants applied to the Commission to rezone said property from R-6 to R-PHD-SU and for final site plan approval and special permit approval to allow construction of a 27-unit residential building referred to Pemberwick Common Apartments. The special CT Page 4916 permit sought authorization to construct a structure in excess of 150,000 cubic feet in volume pursuant to sections 6-17 and 6-101 of the Building Zone Regulations of Greenwich, as amended [the "Regulations "].
The Commission held hearings on the application on April 4, 1989 and April 25, 1989. At a meeting held on June 27, 1989, the Commission approved the requested zone change, approved the special permit with modifications, and approved the site plan with modifications.
Section 8-9 of the General Statutes provides that appeals from a zoning commission may be taken to the superior court in accordance with section 8-8. Conn. General Statutes 8-9
(rev'd to 1989).
Aggrievement is a prerequisite to maintaining an appeal. Smith v. Planning and Zoning Board, 203 Conn. 317, 321 (1987). Appeals taken under section 8-8 are limited to persons "aggrieved" by a decision of the local authority and to persons "owning land which abuts or is within a radius of one hundred feet of any portion of the land involved in any decision" of the local authority. Conn. General Statutes 8-8 (a) (Rev'd to 1989).
At the hearing held in this appeal on May 30, 1990, a general partner of plaintiff, Joel Banker, testified that plaintiff owns property abutting the subject property of PIC, and two deeds in support of that testimony were submitted. Plaintiff's name also appears on a list of "abutting owners" attached to an affidavit by the applicants' attorney, Bruce F. Cohen, in which Cohen states that he mailed notice of the application to all those listed as abutting owners. The court finds that plaintiff is statutorily aggrieved.
 II
A person who is aggrieved by a decision of the local authority "may, within fifteen days from the date when notice of such decision was published in a newspaper . . .; take an appeal to the superior court . . . ." Conn. General Statutes8-8 (a) (Rev'd to 1989). Notice of the Commission's decision was published on July 10, 1989. The Commission, the Town Clerk and PIC were all served on July 24, 1989, within the fifteen-day appeal period. A motion by Robert Testa and John I Farrell to intervene as party defendant was granted in November 10, 1989. Public Act 90-286 provides that appeals from municipal authorities such as the commission in which a decision was not yet rendered as of the date of its passage are to be considered timely if the defendants were served within CT Page 4917 the fifteen-day appeal period. Conn. Pub. Acts No. 90-286, 1, 3, 9 (1990). Plaintiff's timely appeal vests the Court with jurisdiction to hear the matter.
 III
Although the Applicants applied for separate change of zone, special permit and site plan approvals because, consideration of some of the source record evidence overlaps regarding all of them, the Court will first discuss that common record evidence.
The R-PHD-SU Zone is a zone that "may be located only in those areas shown on the Town's plan of development for Planned Housing Design as adopted by the Commission and approved by the Representative Town Meeting." Greenwich Building Zone Regulations 6-63 (November 1986, as amended) [hereinafter, "Regulations]. No properties are automatically in this zone; rather, if the property is within one of the qualified areas shown on the Town's Plan of Development, application may be made to have the zone changed to R-PHD-SU Zone. Regulations 6-71, 6-72. The areas qualified for the Zone have been limited by the Town to the vicinity of E. and W. Putnam Avenues at opposite ends of the Town, near the Stamford and Port Chester borders.
The R-PHD-SU Zone is intended to permit a type of residential development that will serve the housing needs of those Town residents and employees who seek small residential units at a reasonable cost." Regulations 6-62(b). The units in the R-PHD-SU Zone are limited by the Regulations to certain maximum floor areas for efficiency, one-bedroom and two-bedroom apartments. Regulations 6-64. Other, similar types of limitations also apply, but are not at issue here. See Regulations 6-65 through 6-70.
The Commission upon application in the manner presented, "may permit residential development that conforms to the standards and requirements described [in the Regulations] when [five (5)] listed purposes are to be accomplished. . ." Regulations 6-62(c). One such purpose is to "conserve and preserve land to assure that its development will best maintain and enhance the appearance, character, and natural beauty of an area." Regulations "6-62(c)(3). Another stated purpose is to "provide attractive decent and suitable housing at reasonable cost for those who live or work in Town." Regulations 6-62(c)(4). "Any [R-PHD-SU Zone] approval is based upon findings by the Commission that the purposes specified [in section 6-62(c)] will be met and that the Plan will not be detrimental to the health, safety, property values and CT Page 4918 residential character of the neighborhood nor materially adversely affect single family residential area." Regulations 6-72(a)(2).
Plaintiff claims that there is insufficient evidence to support a finding that the purpose stated in section 6-62(c)(3) of the Regulations, to "conserve and preserve land to assure I that its development will best maintain and enhance the appearance, character and natural beauty of an area", will be accomplished by the application. Plaintiff argues that the record reveals that the only evidence presented at the public hearings on this issue demonstrates negative effects contrary to the stated purpose.
In support of this argument, plaintiff cites to those pages of the April 4, 1989 transcript in which the Commission raises concerns as to the extreme length, height and prominence of the proposed structure. Plaintiff also points out that counsel for plaintiff stated that "as you come in to Greenwich on the Post Road, this is probably the most prominent site that you will see." A resident of Pemberwick Road stated, "that building is a monster of a building as it is depicted there on the drawing." A neighbor who owns property on Homestead Lane across from the site stated that with the building located on a landing that- is about 20 feet above his home, "I am going to be looking out, sitting on my deck and looking at a 60 foot monolith outside my back door." Another Homestead Lane resident said the building would be an eyesore and would block sunlight.
Plaintiff claims that there is insufficient evidence to support a finding that the purpose stated in section 6-62(c)(3) of the Regulations, to "conserve and preserve land to assure that its development will best maintain and enhance the appearance, character and natural beauty of an area," will be accomplished by the application. Plaintiff argues that the record reveals that the only evidence presented at the public hearings on this issue demonstrates negative effects contrary to the stated purpose.
In support of this argument, plaintiff cites to those pages of the April 4, 1989 transcript in which the Commission raises concerns as to the extreme length, height and prominence of the proposed structure. Plaintiff also points out that I counsel for plaintiff stated that "as you come in to Greenwich I on the Post Road, this is probably the most prominent site that you will see." A resident of Pemberwick Road seated, "that building is a monster of a building as it is depicted there on the drawing." A neighbor who owns property on Homestead Lane across from the site stated that with the building located on a CT Page 4919 landing that is about 20 feet above his home, "I am going to be looking out, sitting on my deck and looking at a 60 foot monolith outside my back door." Another Homestead Lane resident said the building would be an eyesore and would block sunlight.
In addition, the record reflects that after the hearing on the preliminary application, which the parties state was July 19, 1988, the applicants redesigned the project based on comments from the Commission. The changes included an increase in the setback from 30 to 35 feet on all sides, a sidewalk, a gravel walking path and benches, a terrace for recreational use, saving the trees on the property, and adding pine trees and a hedge along the front and back to buffer the parking area, and reducing the building size by approximately 1,785 square feet.
Also, the design was submitted to the Town's Architectural Review Committee [the "ARC"], which suggested improvements to the buildings and landscaping. Mr. Reily indicated that the applicants intend to comply with the ARC comments and recommendations. Two suggestions of the ARC were specifically incorporated into the Commission's approval as modifications, along with numerous other modifications.
A trial court is not at liberty to substitute its judgment for that of the administrative tribunal. Frito-Lay, Inc. v. Planning and Zoning Commission, 206 Conn. 554, 572-73 (1988) (citations omitted). The court is simply to determine whether the record reasonably supports the conclusions reached by the agency. Primerica v. Planning Zoning Commission. 211 Conn. 85,96 (1989).
Despite the fears voiced by neighboring property the Record contains evidence upon which the Commission could have reasonably found that the purpose stated in section 6-62(c)(3) of the Regulations would be accomplished by the application. Plaintiff also claims that there is sufficient evidence to support a finding that the purpose of section 6-62(c)(4), to provide "attractive decent and suitable housing at reasonable cost for those who live or work in Town," will be accomplished by the application. Plaintiff argues that the record reveals that, rather than providing reasonable cost housing, the proposed building would instead provide 22 "market-rate" rental apartments, which does not guarantee "reasonable cost" housing, and five (5) units aimed at satisfying regulations applicable to a different type of zone under section 6-110(g) of the Regulations which concerns Moderate Income Dwelling Units.
Specifically, plaintiff claims that the record does not CT Page 4920 reveal an adequate basis upon which the Commission could have determined that the "reasonable cost" requirement was met. Plaintiff asserts that the Commission prevented, it from introducing evidence of construction costs, carrying costs and economic feasibility, questioning its relevancy. Plaintiff argues that such information is directly relevant to the issue of whether the units can be provided to tenants at a reasonable cost.
However, the Record shows that while the Commission questioned the relevancy of such information, it listened to a lengthy presentation of such information by Joel Banker, General Partner of Gateway, on this issue. Mr. Banker introduced documentary evidence depicting a building in Poughkeepsie, New York, which he considered comparable to the proposed Pemberwick Common Building. He testified that his analysis showed that total cost would be about $3,728,000. Based on the carrying costs attendant to such an expensive project, Mr. Banker characterized the proposed units as "luxury housing." He went on to explain that given his calculations, the rental charge for the units would need to be $2,000 a month, that this would mean there would be two wage earners in each apartment and an increase in traffic. Furthermore, the units would be difficult to rent and therefore depreciate and not be maintained.
In addition, plaintiff's counsel sent the Commission a letter following the April 4, 1989 hearing in which he supplements the testimony of Mr. Banker on the issue of "reasonable cost," discussing the language of the Regulations and construction estimates from Atlas Construction, a "leading" contractor, which purportedly show how costly the project will be. Counsel also introduced this letter at the next meeting of the Commission, and it was made part of the record.
Therefore, plaintiff was permitted to introduce evidence and testimony on the matter of "reasonable cost."
The issue still remains, however, as to whether the Record supports the Commission's decision that the "reasonable cost" requirement would be satisfied. In its letter of approval the Commission stated that it "finds that the average floor area of the proposed unit-types satisfies the reasonable cost criteria of the purposes of the R-PHD-SU Zone." The Commission also stated that "in order to further the purpose of providing affordable housing the developer is restricting five units to rent regulation in accordance with the criteria of Sec. 6-110(g)(4) and 6-110(g)(5) of the . . . . Regulations."
At the public hearing April 4, 1989, the applicants stated CT Page 4921 their intention to designate 5 of the 27 proposed units as moderate income dwelling units under section 6-110(g). Plaintiff claims that there "is no meaningful evidence" to establish that the "reasonable cost" requirement could be met for the remaining 22 units. Plaintiff argues that the Commission's "trade-off of five `affordable' units for twenty-two luxury `market rate' units undermines and defeats the stated purposes of the R-PHD-SU Zone, by applying criteria not applicable to the zone applied or," and that the Commission accepted the offer of 5 affordable units as proof that the project would yield "reasonable cost" housing. Plaintiff states that the Commission's decision appears to consider only the relatively small size of the proposed units, as opposed to the construction and carrying costs of the project.
Defendants argue that the Town does not regulate the "reasonable cost" of housing units; rather the R-PHD-SU Zone is designed such that the units will command reasonable rents due to their modest size and less desirable locations. Defendants I also claim that it would be pointless for the Commission to examine construction costs since they could increase or decrease before or during construction. These projects and risks associated with them are undertaken and borne by the developer, and it is not the Commission's job to guess whether a project can be completed under or over budget. Furthermore, defendants argue that the Regulations do not require the Commission to investigate the developer's construction costs.
The Record reflects that in response to plaintiff's presentation regarding construction costs, counsel for applicants submitted a letter to the Commission stating the following:
a. My client's estimates of construction costs are over $1,000,000 less than Mr. Banker's.
b. Because my client acts as his own general contractor, and because he controls the land based on a long-term lease at a reasonable rental, the improvements can be provided at costs that are considerably less than those prevailing in this area.
c. My client intends to provide rental — not condominium — housing, at reasonable rental rates, and believes that this is a reasonable commercial objective.
(Record, Item 38.) CT Page 4922
Also, counsel for the applicants stated the following at the April 4, 1989 hearing:
 There is an objection that somehow this is going to be too expensive and you shouldn't approve it because they say, how could we afford to charge affordable rents.
 If it is too expensive and my clients are dummies and expect that they're going to get out of a 660,000 square feet $2,500 a month rent, well, the bank is probably going to be happy to charge maybe $800 worth of rent when they take it over from my foolish clients.
 The fact of the matter is we are builders that build on our own account; we don't charge profit and overhead . . .
* * *
 We don't have any fancy land costs that we have to amortize because this is not a land purchase. We believe that we can build this project for more than a million dollars less than Mr. Banker thinks we can.
 My clients believe they can build this project and charge reasonable rents that will range from $900 and $1,200 for the market rate apartments and charge what the Town requires for the five affordable units and still make a profit.
 And isn't that the kind of affordable housing that we would like to have in Town?
The Commission also had evidence that the size of the units was reduced according to its suggestion. (Record 29, p. 4.) Evidence of small unit size would tend to support a finding that the units would be rented at a "reasonable cost."
Based on the foregoing, the Record contains evidence upon which the Commission could reasonably have concluded that the purpose stated in section 6-62(c)(4) of the Regulations, concerning "reasonable cost" housing, would be accomplished by the project. CT Page 4923
As to the plaintiff's claim that requirements for moderate income dwellings were improperly applied to the application and undermine the purposes of the R-PHD-SU Zone, the plaintiff has failed to carry his burden of proof on this issue. The Record supports a finding that even without the five moderate income dwellings, the project would meet the reasonable costs requirement.
Furthermore, section 6-110(g) does not prohibit a developer from agreeing to offer a number of the units in a residential apartment building at moderate income rental prices. Rather, section 6-110(g) allows the Commission to provide incentives to construct moderate income units by allowing "modifications of these Regulations . . . in the LB, GB and GBO Zones . . . ." Same of these modifications are referred to as waivers or bonuses. Regulations 6-110(g). Thus, such bonuses are only available when construction is planned in the LB, GB or GBO business zones.
In the instant case, the applicants received no bonuses applicable to other zones. They simply agreed to offer five units at a "below-market-rate" rental price as defined and set forth in sections 6-110(g)(4) and 6-110(g)(5) of the
Regulations. Even counsel for plaintiff stated, "I am not saying that he can't enter into some kind of agreement that might require that . . . ." Great deference is accorded to the agency's construction and interpretation of its own regulations. Griffin Hospital v. Commissions on Hospitals 
Health Care, 200 Conn. 489, 496-7 (1986).
Therefore, the court finds that the Commission did not improperly apply regulations applicable to zones other than the R-PHD-SU Zone in approving the application.
A trial court may grant relief on appeal from a decision of an administrative authority only where the authority has acted illegally or arbitrarily or has abused its discretion. Raybestos-Manhattan, Inc. v. Planning Zoning Commission.186 Conn. 466, 470 (1982). The burden of proof to demonstrate that the local authority acted improperly is upon the plaintiff; Adolphson v. Planning Zoning Commission, 205 Conn. 703, 707
(1988). Although raised in complaint, issues which are not briefed are considered abandoned. State v. Ramsundar,204 Conn. 4, 16 (1987).
 IV
In its brief, plaintiff argues that the record does not support the conclusions made by the Commission in approving the CT Page 4924 zone change, the special permit, and the site plan.
The court will turn first to the zone change application.
A zoning commission is free to alter existing zones but it is required to act with the intention of promoting the best interest of the entire community. Morningside Ass'n v. Planning Zoning Board, 162 Conn. 154, 162. If done for that purpose it is not invalid because a property owner may receive an incidental benefit. Malafronte v. Planning Board,155 Conn. 205, 211
The plaintiff contends that there was insufficient evidence to support a commission finding that the "Plan will not be detrimental to the health, safety, property values and residential character of the neighborhood" as required by section 6-72(a)(2) of the Regulations. Plaintiff claims that the record shows the weight of the evidence presented contradicts this premise, particularly in the area of property values. Plaintiff refers to its own statement at the hearing. on April 4, 1989 that the applicants' proposed structure would "have an extremely adverse effect on the rental value and the possibility of keeping [plaintiff's] office building rented at least as it pertains to those offices that face in an easterly direction." Plaintiff points to no other evidence concerning the claimed negative effect on its property values.
Plaintiff claims that the Commission arbitrarily ignored the purposes of the Regulations, as set forth in section 6-1(a) of the Regulations, specifically, sections 6-1(a)(4), (5), and (7). and provisions establish that the purpose of the Regulations is to provide adequate light and air, prevent overcrowding of land, conserve the value of buildings, and encourage the most appropriate use of the land. Regulations 6-l()(4), (5), (7). In support of this argument plaintiff offers the reasons already discussed above regarding the zone change.
There is evidence in the Record to support a finding that the purposes of the R-PHD-SU Zone will be accomplished. The Commission received various favorable reports by other experts and Town officials. The Sewer Superintendent approved the project. The applicants agreed to correct a road flooding problem on Homestead Lane, which is due to area topography, by installing catch basins there. The Inlands Wetlands and Watercourses Agency reviewed the plan and issued a permit. The ARC made numerous recommendations relating to design, landscaping and the like with which the applicants agreed to comply. The record is replete with information and reports relating to the impact of the project on traffic. While the CT Page 4925 report submitted by plaintiff states that increasing density could hasten traffic congestion, it also attributes the degradation in overall level of service "to the increase in area traffic projected by growth rate," not to the applicants' proposal. The report submitted by the applicants states that "the proposed project can be satisfactorily accommodated in terms of on-site and off-site traffic operations and safety. The projected site traffic will not adversely impact area traffic flows." Section 8-2 does not forbid zone changes which merely increase traffic volume where that volume will not cause congestion. Lathrop v. Planning Zoning Commissions,164 Conn. 215, 222.
Members of a zoning commission may rely on their personal knowledge and may utilize professional technical assistance in arriving at a decision. Frito-Lay, Inc., 206 Conn. at 570,571. The "law does not require that members of zoning commissions must have no opinion concerning the proper development of their communities. It would be strange, indeed, if this were true." Cioffoletti v. Planning Zoning Commission, 209 Conn. 544, 555 (1989) (citation omitted).
The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the agency. Primerica, 211 Conn. at 96. The question is not whether the trial court would have reached the same conclusion, but whether the Record before the agency supports the decision reached. Id.
The Record reasonably supports the conclusion that the proposed plan, is consistent with the requirements of sections 6-72(a)(2) and 6-1(a) of the Regulations.
The Commission did not act improperly in approving the zone change.
Plaintiff argues that the Commission abused its discretion by approving the applicants' request for a special permit. A special permit is required under section 6-101 of the Regulations because the proposed structure would be "in excess of 150,000 cubic feet in volume above established grade." Regulations 6-101(a).
Section 6-17(a) of the Regulations sets forth the standards for review of special permit applications and requires the Commission to consider the criteria stated in section 6-17(d), which includes the standards applicable to site plan approval in section 6-15(a). Section 6-17(a) also provides that the Commission must "determine that the proposed use conforms with the overall intent of these regulations and the purposes of CT Page 4926 each zone, where defined." Regulations 6-17(a). In its decision, the Commission stated that it "finds the project to be consistent with section 6-15 and 6-17 of the . . . Regulations. "
Plaintiff argues that the Commission arbitrarily determined that the applicants satisfied the numerous standards required for the approval of a special permit and that the record does not reveal a reasonable basis for the Commission to have concluded that the proposed use would not materially adversely affect adjacent areas; be in scale with and compatible with surrounding uses; not alter a neighborhood's essential characteristics; preserve and enchance property values through adequate open spaces, screening and buffering; and demonstrate a high quality of building design by providing a design which is in harmony with the existing neighborhood. (Citing Regulations 6-17(d)(4), (9), (11); 6-15 (a)(3)(a), (4)(a).) Plaintiff admits that these standards are substantially equivalent to those required to be considered under sections 6-62 and 6-72, and relies on its discussion of those sections. For reasons already discussed, the court has determined that the Record supports a finding that the application satisfies the standards applicable to sections 6-62 and 6-72. The standards set forth in sections 6-15 and 6-17 are nearly identical to and encompassed within the standards set forth in sections 6-62 and 6-72. The Record reasonably supports the finding that the application satisfies the requirements of sections 6-15 and 6-17 and supports the Commission's decision to approve the special permit.
 VI
Plaintiff claims that the Commission acted arbitrarily in granting the applicants' request for site plan approval. Because a special permit was required for the project, applicants were also required to obtain site plan approval. Regulations 6-13(a)(7).
Section 6-15 of the Regulations sets forth the standards for reviewing site plan applications and requires the Commission to consider the objectives listed in section 6-15(a). In addition, it requires that the Commission consider "the public health, safety and general welfare, the comfort and convenience of the general public . . . ." Regulations 6-15(a).
Plaintiff claims that there was insufficient evidence for the Commission to reasonably determine that the applicants satisfied the standards in section 6-15 for site plan approval. Plaintiff again relies on its discussion of the standards required to be considered under sections 6-62 and 6-72, CT Page 4927 admitting that they are substantially equivalent to those set forth in section 6-15.
The record reveals that the Commission collected and received much data, advice and testimony on the topics contained in the standards for approval. The Commission approved the site plan application subject to eleven detailed modifications designed to satisfy the purposes of the Regulations. The record reasonably supports a finding that the application satisfies the requirements of sections 6-62 and 6-72. Therefore, the Record reasonably supports a finding that the application satisfies the standards in section 6-15 and supports the Commission decision to approve the site plan.
For all of these reasons, the Appeal is dismissed.
FLYNN, JUDGE