[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal from the denial of an application by the Shelton Planning and Zoning Commission for a planned development district, "a creature not normally spotted in Connecticut's jurisprudential forests." Eco Industries, Inc. v. Executive Monarch Hotel, Inc., 4 Conn. App. 659, 662. CT Page 234
The property involved in the appeal contains 16.34 acres, located on Coram Road in Shelton, near the Housatonic River. The subject property is in a residence R-1 district, which has a minimum lot area of 40,000 square feet. The plaintiff applied in March 1989 to change the zoning regulations and building zone map by changing the subject property from the R-1 zone to a Planned Development District (hereafter called PDD) and for approval of a basic development plan for the PDD. As part of the application plans, analogous to a special permit or site plan application, were filed with the defendant Commission. The project known as Miles View consisted of three multi-family residential condominium buildings containing 98 dwelling units with garages and open parking for 200 cars and recreational facilities. The proposed buildings were four stories in height with a basement.
A public hearing was held on the application on June 13, 1989. There was opposition to the proposal, with the objections falling mainly in three areas: (1) the project would generate too much traffic and cause traffic problems; (2) the project would have an adverse impact on the surrounding residential area because of its size and density; and (3) development of the project would increase water discharge upon surrounding properties. In August 1989 the Commission was concerned about making a decision on the application within 65 days of the public hearing, and requested an extension from the applicant. Mileski's attorney wrote a letter dated August 15, 1989 stating that "I hereby grant the Shelton Planning and Zoning, Commission permission to waive the 65 day time limit in which to render their decision." At its meeting of August 22, 1989 the Commission voted to accept the 65 day extension to make its decision.
On October 24, 1989 the Commission denied the application and gave 7 reasons for denial. These can be summarized as follows: (1) the size of the project and the proposed density was too great; (2) the proposal would have an adverse impact on the surrounding neighborhood; (3) inadequacy of proposed road improvements adjacent to the project; (4) questions concerning substantial future increases in traffic and changes in traffic patterns in the area; (5) multi-family development is possible by using a Planned Residence District, which would produce less than half the density of the PDD proposal; and (6) a limited market for multi-family condominium units. The plaintiff took a timely appeal from the Commission's decision, and makes the following claims in the appeal: (1) The application was CT Page 235 approved because the Commission did not deny it within the time period specified in section 8-7(d) of the General Statutes; (2) the application complied with the discernible standards in section 34 of the Zoning Regulations; (3) some of the standards in section 34 are illegal; and (4) the reasons given by the Commission for denial of the application are insufficient.
As the property owner and unsuccessful applicant to the Commission, the plaintiff was specially and injuriously affected by the Commission's decision and has proven aggrievement. Bossert Corporation v. Norwalk, 157 Conn. 279,285.
1. Review of reasons for denial of application
Where an administrative agency gives reasons for denial of a land use application, the denial must be upheld if even one of the reasons given is legally sufficient. Burnham v. Planning Zoning Commission, 189 Conn. 261, 265 (zone change); First Hartford Realty Corporation v. Plan Zoning Commission, 165 Conn. 533, 543 (zone change); Housatonic Terminal Corporation v. Planning Zoning Board, 168 Conn. 304,305, 306 (special permit); Frito-Lay Inc. v. Planning 
Zoning Commission, 206 Conn. 554, 576 (special permit); Goldberg v. Zoning Commission, 173 Conn. 23, 26 (site plan); Allied Plywood, Inc. v. Plan Zoning Commission, 2 Conn. App. 506,512 (site plan). When a zoning commission acts on a zone change it acts in a legislative capacity. Primerica v. Planning and Zoning Commission, 211 Conn. 85, 96. Parks v. Planning and Zoning Commission, 178 Conn. 657, 660. It also acts in a legislative capacity when amending zoning regulations. Pierrepont v. Zoning Commission, 154 Conn. 463,468. While there are some problems with the commission's procedures and regulations as discussed below, basically in adopting a PDD designation for the subject property the commission is both changing the zone and amending its regulations, in which case a Superior Court on appeal should not substitute its judgment for that of the commission, unless the appellant proves that the commission's action was clearly arbitrary or illegal. Burnham v. Planning and Zoning Commission, supra, 267; Calandro v. Zoning Commission,176 Conn. 439, 440-442. To grant a zone change a two part test must be met: (1) the zone change must be in accordance with the comprehensive plan and (2) reasonably related to the normal police power purposes in section 8-2. First Hartford Realty Corporation v. Plan and Zoning Commission, supra, 541; Damick v. Planning and Zoning Commission, 158 Conn. 78, 83,84. CT Page 236
Several of the reasons for denial were related to the density of the proposed project. While there are no specific standards for density in the zoning regulations for a PDD, the proposal was in effect for a change in zone. The surrounding residential areas were in the R-1 Zone with a density of about one residential dwelling unit per acre, while the proposal, for 98 units on 16.34 acres of land, would be at a density of six units per acre. Based on the evidence before it and its knowledge of the area, the Commission could also reasonably find that a project of this magnitude was not consistent and compatible with the surrounding neighborhood, and would have an adverse impact on it. Since, it was not consistent with existing uses in the area and existing zoning as shown on the zoning map, the Commission's conclusions support a finding that the proposed change is not in accordance with the comprehensive plan. Burnham v. Planning and Zoning Commission, supra, 267. While the lack of a market for condominium units is not, strictly construed, a reason for denial of an application, zone changes should not be made unless the change is required for the public good, Damick v. Planning and Zoning Commission, supra, 84, and the Commission could reasonably find that a glut of unsold condominium units on the local housing market was not in the City's best interest.
Two of the assigned reasons were related to traffic and related road improvements. A zoning commission has substantially greater discretion in turning down a zone change, as opposed to an administrative type application, based upon existing or anticipated traffic problems. Denial of a zone change should be upheld where the zone change increases traffic congestion or causes a traffic hazard. Calandro v. Zoning Commission, supra, 441; Burnham v. Planning and Zoning Commission, supra, 262, 263; Whalen v. Town Plan and Zoning Commission, 146 Conn. 321, 326. The material consideration under section 8-2 of the General Statutes is not the overall volume of traffic, but whether the increase in traffic will cause congestion. Lathrop v. Planning and Zoning Commission, 164 Conn. 215, 222; Stiles v. Town Council, 159 Conn. 212, 219. It is debatable whether the evidence on the record reasonably supports a conclusion that streets in the area, even with anticipated traffic from a 98 unit condominium project will cause traffic congestion. However, Section 34.8f of the Zoning Regulations requires the Commission to make a specific finding in order to approve a PDD that "the streets and drives will be suitable and adequate to accommodate anticipated traffic and projected development intensity will not generate traffic in such amounts as to overload the street system in the area." The zoning commission can rely on personal knowledge of its CT Page 237 members on such items as traffic congestion and street safety. Primerica v. Planning and Zoning Commission, supra, 97, 98.
Finally, one of the reasons for denial was that "multi-family development is also possible under a planned residence district format, and it would produce less than half the density of the current proposal." Section 34.8b requires the commission to make a finding in order to approve a PDD that "another zoning district could not be appropriately established to accomplish such purposes." As the plaintiff points out, this section basically gives the commission unlimited discretion to disapprove any proposal, because it is always possible to adopt another zoning district covering the same proposed use, and in many cases a planned residence district under section 35 of the Zoning Regulations would be available. This reason for denial was technically correct, however, even though its legality is questionable. Since the Commission gave at least some valid reasons for denial of the PDD, the applicant's challenge to the Commission's decision on the merits must fail.
2. Claim of compliance with standards in regulations
Since the plaintiff is not entitled to approval of a PDD, it is unnecessary to consider whether he complied with all of the requirements for plans and drawings and submitted all of the documents and approvals from other agencies required under Section 34. Without a zone change and modification of the zoning regulations the other plans submitted with the application could not be approved. See Coastal Suburban Builders Inc. v. Planning and Zoning Commission, 2 Conn. App. 489, 493. For similar reasons the plaintiff's challenge to the vagueness of certain standards in section 34 does not have to be resolved either, assuming the plaintiff has standing to do so. A challenge to administrative regulations on the ground of vagueness amounts to a constitutional challenge. Powers v. Common Council,154 Conn. 156, 161. When a property owner makes an application to an administrative agency, this precludes him from attacking the constitutionality of the ordinance in an administrative appeal from the agency's decision. Bierman v. Planning and Zoning Commission, 185 Conn. 135, 139; J M Realty Co. v. Norwalk, 156 Conn. 185, 191; Strain v. Zoning Board of Appeals, 137 Conn. 36, 38, 39.
3. Mandatory approval claim
The plaintiff's final claim is that even though the Commission turned down the application that it did not do so CT Page 238 within the statutory time limits, so that the application had to be approved. The Commission claims that the plaintiff waived the time limit of 65 days after the public hearing for decision on application, because the plaintiff granted it an extension of time to decide it. The plaintiff counters that all that could be granted was a 65 day extension and that the Commission went beyond that time limit, and that the result was mandatory or automatic approval of the application.
The plaintiff relies upon cases such as Vartuli v. Sotire, 192 Conn. 353, 362 (holding that a coastal site plan was approved when it was not decided within the time limits in section 8-7d(b) of the General Statutes); and Carr v. Woolwich, 7 Conn. App. 684, cert. denied, 201 Conn. 804
(1986). Carr involved a site plan and zoning permit application which a planning and zoning commission failed to schedule for a public hearing. Section 8-3(g) of the General Statutes provided that a site plan was approved if the commission failed to act upon it within the time limits in section 8-7d of the General Statutes, which requires the agency to make a decision within 65 days after completion of the public hearing. The application in the Carr case was under subsection (b) of section 8-7d, which required a decision within 65 days of receipt of a site plan. The court concluded that since the commission failed to act on the site plan within the time limit that it was considered approved under section 8-3(g). Id., 697, 700. A similar result was reached in SSM Associates Limited Partnership v. Plan and Zoning Commission, 15 Conn. App. 561 (1988), affirmed,211 Conn. 331 (1989). The Supreme Court concluded however that the case was governed by subsection (b) of section 8-7d, and declined to decide whether mandatory approval also resulted from noncompliance with subsection (a) of the statute.211 Conn. at 338. Earlier, in Carr v. Woolwich, supra, 697, 698, the Appellate Court discussed the requirements under section8-7d(a), although the site plan application before it was only under subsection (b). It concluded however, that subsection (a) covers all zoning matters which involve a formal petition, application, request or appeal in which a hearing is required, with two exceptions: (1) where only site plan approval is required under subsection (b); and (2) where a zone change or change in zoning regulations is initiated by a zoning or planning and zoning commission. Subsequently, the Supreme Court implied in SSM Associates Limited Partnership v. Plan and Zoning Commission, supra, 337, 338 that there was a material difference between compliance with the time limitations and subsections (a) and (b) of section 8-7(d). It also specifically declined to find automatic approval where a zoning commission did not complete a public hearing on a special permit and related site plan application within 30 CT Page 239 days, as required by section 8-7d (a), in Frito-Lay, Inc. v. Planning and Zoning Commission, 206 Conn. 554, 563, 574, 575
(1988).
Since neither the Appellate Court nor the Supreme Court have squarely decided the issue as to whether failure to act upon a zone change application within 65 days after completion of the public hearing results in mandatory approval, the status of the law on this issue remains unclear. The statements in Carr v. Woolwich, supra, are not binding precedent, since the doctrine of stare decisis applies only to points actually involved and determined in a case, Riley v. Board of Police Commissioners, 145 Conn. 1, 5
and the precedential value of a case should be limited to the factual basis of the decision. State v. Ouellette,190 Conn. 84, 90, 91. While section 8-7d(a), if it applies here, states that a zoning commission "shall" hold a public hearing within the stated time limits, this still raises the question whether that requirement is mandatory or merely directory. See Zoning Board of Appeals v. Freedom of Information Commission, 198 Conn. 498, 503; Donohue v. Zoning Board of Appeals, 155 Conn. 550, 554. The general rule is that time limits for public officials to act are directory only, and failure to act on time does not invalidate action which is taken late. Blau v. State Board of Education, 19 Conn. App. 428,430, 431; Ruotolo v. Inland Wetlands Agency, 18 Conn. App. 440,448, cert. denied 12 Conn. 807.
4. Effect of extension of time to decide the application
The defendant claims that the mandatory approval concept does not apply here because the plaintiff gave it an additional 65 days to decide the application. Since the public hearing was on June 13, 1989, the 65th and last day to decide the application was August 17th. The plaintiff granted an extension by the letter from his attorney dated August 15th. The Commission "accepted" the extension at its meeting on August 22nd. The Commission actually decided the application on October 24, 1989. This was less than 65 days from the August 22nd meeting, but more than 65 days from the letter granting the Commission a 65 day extension, and also more than 65 days from August 17, 1989, when the original 65 day period ran out. The plaintiff claims that the maximum extension of time that can be granted is 65 days and that the clock does not start from the date the Commission votes to "accept" the extension.
Neither party has found case law on this question. After providing that a decision is required within 65 days after completion of the public hearing, section 8-7d provides that CT Page 240 the "applicant may consent to one or more extensions of any periods specified in this subsection, provided the total extension of any such period shall not be for longer than the original period as specified in this subsection." Under the statute the extensions of time are given by the applicant and are within his control. Just as an administrative agency cannot adopt a procedure different from the statute and decide when it wishes to receive an application, Viking Construction Co. v. Town Planning Commission, 181 Conn. 243,247, the Commission cannot extend the statutory time limits by deciding when and whether to accept the extension. The statute does not allow the total extension to exceed 65 days. Common sense and the phrasing of the statute would suggest that the extension would run from the end of the original time period, not when the applicant grants it, and that the extension could be for any period up to 65 days. The letter here did not specify the length of the extension, and since it was open ended it can be considered a 65 day extension. In any event, if the extension period is measured from the date the plaintiff gave the extension or from the end of the original 65 day period, the plaintiff is correct that the Commission's decision, rejecting the application, was beyond the 65 day limit. This squarely raises the question whether the Commission's failure to decide the application on time is only directory, or whether it is mandatory and results in automatic approval. This requires a consideration of the nature of the application and the statutory authority for it.
5. Authority for PDD application; effect of statutory time limits
Neither the attorney for the Commission or the attorney for the applicant, an experienced land use lawyer, were able to identify either in the briefs or in oral argument exactly what type of zoning approval a PDD is or the statutory authority for it. Section 21-3 of the Shelton Zoning Regulations defines a PDD as "a class of district established in accordance with section 34 and located within a Special Development Area." A Special Development Area is defined in Section 21.2 as "a class of district in addition to and overlapping one or more of the other districts." The record indicates that the subject property was approved by the Commission as a Special Development Area (SDA) in 1986. This is a prerequisite for a PDD under section 34.1. Section 34.4 contains a provision for informal consideration of a PDD application containing a Basic Development Plan under section 34. 5. 2 prior to the submission of a formal PDD application. The Basic Development Plan under section 34.5.2 contains numerous detailed plans and documents. Section 34.6 allows CT Page 241 the Commission to approve the Basic Development Plan "only after the Commission makes the findings set forth under paragraph 34.8 below, in addition to other findings necessary for amendment of these Regulations. Approval of the Basic Development Plan shall not constitute final approval of the Planned Development District and shall simply authorize the submission of Detailed Development Plans setting forth in detail the specifics of the proposed development and showing modifications specified by the Commission. If the Detailed Development Plans are approved by the Commission, the Planned Development District shall be considered established and these Zoning Regulations and zoning maps shall be considered to be modified to permit the establishment of the development as approved." Section 34.8 provides that the Commission cannot adopt a PDD, thereby amending the Zoning Regulations on the zoning map until it makes certain specified findings in addition to other requirements for amending the Zoning Regulations. Final approval cannot be given until the third stage of the approval process, the submission of Detailed Development Plans under section 34.7, which includes, among other things, a site plan.
The Commission contends, and the plaintiff does not appear to dispute that the application here was the second step of the three stage proceeding in Section 34 of the Zoning Regulations. [The first step was location of the property within an SDA. The second step was an informal application with a Basic Development Plan. The third and final step is a formal or final application for a PDD with Detailed Development Plans].
Chapter 124 of the General Statutes governs approvals by a zoning commission. Since step two of the PDD procedure does not result in a zone change or amendment to the zoning regulations, it is not governed by applications for changes in zoning regulations or zone boundaries under section 8-3
subsections (a) through (d) of the General Statutes. It is not a site plan application under section 8-3(g). See Segan v. Planning and Zoning Commission of Shelton, Superior Court at Milford No. CV89-0272075, June 6, 1990, (Meadow, J.) It also is not a special permit application under section 8-3(c). Section 8-7(d)(a) contains time limits where "a formal petition, application, request or appeal must be submitted to a zoning commission, planning and zoning commission or zoning board of appeals under this chapter and a hearing is required on such petition, application, request or appeal. . . ." (emphasis added). As previously discussed, there is a serious question whether the Supreme Court will follow the decision in Carr v. Woolwich, supra, on a legislative type application, such as a zone change or change in zoning regulations, in which case CT Page 242 there would be no mandatory approval if the commission failed to act within the time limits in section 8-7d of the General Statutes. The second step of a PDD application under section 34 of the Shelton Zoning Regulations is not a submission to a zoning commission under Chapter 124 of the General Statutes, so that the application here was not approved under section8-7d even though the commission was late in deciding it.
While it is not necessary to resolve it, there is serious question concerning source of the statutory authority for the PDD procedure itself. While zoning commissions have broad authority given to them by the general statutes, that authority is not unlimited. A zoning ordinance must comply with and serve the purpose of the statute under which the authority to regulate is granted; "a local zoning commission is subject to the limitations prescribed by law and the power to zone is not absolute but is conditioned upon an adherence to the statutory purposes to be served." Builders Service Corporation v. Planning and Zoning Commission, 208 Conn. 267, 275. The authority of a zoning commission to regulate land uses is governed by section 8-2
of the general statutes. While that grant of authority has been liberally construed by the courts, there are limitations. A regulation or change of zone not in accordance with the purposes of section 8-2 is illegal. Kavanewsky v. Zoning Board of Appeals, 160 Conn. 397, 403, 404. For example, at one time special permits were not authorized and a statutory amendment was required in 1959 to allow them. See Summ v. Zoning Commission, 150 Conn. 79, 84-86. Section 8-2
provides in part as follows:
 "All such regulations shall be uniform for each class or kind of buildings, structures or use of land throughout each district, but the regulations in one district may differ from those in another district, and may provide that certain classes or kinds of buildings, structures or uses of land are permitted only after obtaining a special permit or special exception from a zoning commission, planning commission, combined planning and zoning commission or zoning board of appeals, whichever commission or board the regulations may, notwithstanding any special act to the contrary, designate, subject to standards set forth in the regulations and to conditions necessary to protect the public, health, safety, convenience and property values. . . ."
In Langer v. Planning and Zoning Commission, 163 Conn. 453, CT Page 243 458, it was held that it was illegal for the zoning commission to vary uses allowed for property on an application to application basis. In Veseskis v. Bristol Zoning Commission, 168 Conn. 358, 360, 361 and Bartsch v. Planning and Zoning Commission, 6 Conn. App. 686, 689, it was held that requiring a special condition to be attached to property in order to grant a zone change was a violation of the uniformity provision in section 8-2. In a related context, in North Rollingwood Property Owners Ass'n. v. City Plan Commission, 152 Conn. 518, it was held to be illegal for a planning commission to act without regulations and approve special housing or apartment projects on a case by case basis. Court decisions have approved the concept of a "floating zone", which is "a special detailed use district of undetermined location in which the proposed kind, size and form of structures must be preapproved. It is legislatively predeemed compatible with the area in which it eventually locates if specified standards are met and the particular application is not unreasonable. . . .it differs from the traditional `Euclidean' zone in that it has no defined boundaries and is said to `float' over the entire area where it may eventually be established." Schwartz v. Town Plan 
Zoning Commission, 168 Conn. 20, 22 (citing other floating zone cases at pages 22, 23). However, the PDD provisions in section 34 are not provisions for a floating zone. Unlike a floating zone, section 34 does not contain particular types of uses that are preapproved for placement on particular properties at a later date. Under section 34 the commission has virtually unlimited discretion on what to allow for a PDD, and it can always fall back on section 34.8 in denying one. Under that section virtually any use could be established as a permitted use in another zoning district, in either an existing district, or one specially created for the purpose. Related to this, section 34 contains inadequate, vague standard to determine when a PDD will be allowed. The only limitation is that a PDD can only go in a special development area, which in turn is a district overlaying one or more other zoning districts (Section 21.2), but there also are no standards in the regulations for the criteria in establishing an SDA. The PDD procedure is not consistent with section 8-2, conflicts with the uniformity provision in that statute, and is not authorized by Chapter 124.
The PDD regulations in section 34 of the Shelton Zoning Regulations are similar to those allowed in Chapter 124a (sections 8-13a through 8-13l C.G.S.), but the Shelton regulations fail to conform to those statutes in some respects, including designation of uses permitted in the PDD, as required by section 8-13d (a) and certain other required standards. The provision for approval of Basic Development CT Page 244 Plans followed by Detailed Development Plans under section 34 are similar to the provisions in section 8-13; and 8-13j for tentative approval and final approval of planned unit developments. While section 8-13h (a)(3) provides that the failure of the commission to act on an application for tentative approval of a planned unit development plan within 65 days after the public hearing, that provision in Chapter 124a no longer applies, if it ever did, to this application for several reasons.
It is unclear from the record whether Chapter 124a was adopted by Shelton in accordance with the procedures in section 8-13c, particularly since the zoning regulations fail to conform to the statutes in several respects. Even if section 34 was based on Chapter 124a, those statutes were repealed by Public Act 85-409 section 7, effective July 1, 1985. Section 6 of the 1985 Act, now section 8-2d of the General Statutes, allowed then existing zoning regulations for planned unit developments and planned residential developments to continue to be valid, and it provided that tentative, preliminary or final plans approved by the commission prior to July 1, 1985 would continue to be governed by those regulations. Implicit in Public Act 85-409 is that new planned unit developments could not be authorized under Chapter 124a after that date.
In addition, there was a requirement in section 8-13i (c) that if the property owner failed to file an application for final approval within the time period required after tentative approval [3 months under section 8-13h(c)], that tentative approval was revoked. No final application was filed here. The commission's failure to act within the statutory time limits did not result in automatic approval of the plan.
The appeal is dismissed.
ROBERT A. FULLER, JUDGE.