[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal from the decision of the Enfield Planning and Zoning Commission (hereinafter the "Commission") granting an application for a special use permit for the operation of a baseball school on property known as 1320 Enfield Street, Enfield, Connecticut. The subject real property, consisting of approximately two acres, is located in R-33 and HR-33 zones, both one family residence districts.[1] Plaintiff's land, known as 8 Mitchell Drive, abuts the subject property.
A review of the record returned to court discloses the following facts. Prior to March 25, 1992, Mr. Cressotti forwarded to the Town Planner a letter of intent to establish a home occupation at 1320 Enfield Street, which use would "involve baseball instruction to the youth of Enfield." The letter recited the following:
 "The number of youth being instructed at one time will not exceed 10, and will take place during the hours of 9 a.m. — 11 a.m.; 12 p.m. — 2 p.m.; and 5:30 p.m. — 7:30 p.m. for three weeks of the summer. CT Page 3277
 "In addition to group instruction, individualized instruction would take place by the hour. The only noise factor involved would be a pitching machine, located within a batting cage causing no liability to surrounding properties."
The letter of intent was answered by the Zoning Enforcement Officer who expressed concerns about the proposed activity being conducted outside of the house and possibly generating objectionable noise;[2] Mr. Cressotti was directed to apply for a determination by the Planning and Zoning Commission. On April 20, 1992, Mr. Cressotti filed an application for a special use permit with the Commission; this application stated that the special use permit was sought pursuant to Sections 9-1.2, 9-1.8, and 16-2.4 of the Ordinance and set forth the details of the proposed use in a manner substantially identical to those contained in the prior letter to the Town Planner.[3]
A public hearing on Mr. Cressotti's application was duly noticed for May 7, 1992 at 7:30 p.m. at the Enfield Town Hall.[4] Prior thereto, on or about April 30, 1992, the Town Planner forwarded a memorandum regarding an Administrative Review Team meeting on May 5, 1992; in the detailed memorandum from the Town Planner, it was stated that certain types of special uses could be allowed by the Commission if they meet the standards of Section 16 of the Ordinance which pertain to such issues as traffic impact, compatibility (will not discourage appropriate use of adjacent land), and general harmony with the neighborhood. According to the memorandum, the applicant was required to provide the Commission with a projection of the amount of traffic expected to be generated by the proposed facility and a map showing the location of the proposed activities in relation to the boundaries of the subject property and to surrounding homes. It was stated therein that the Commission had authority to impose conditions designed to control the use such as limitations on the number of students, hours of operation, and specifications regarding the location of outside equipment and activities, as well as potential screening between equipment and the surrounding homes. At the May 5 meeting of the Administrative Review Team, a number of concerns were raised, including: the amount of drop-off traffic, the width of the driveway (particularly CT Page 3278 with respect to handling two-way traffic), and the possibility that traffic would back onto Route 5; it was observed that parking along the driveway would obstruct access by fire and emergency equipment to the house and, that there would exist the potential for the creation of nuisances which might injure and interfere with the enjoyment of neighboring properties. The ART commented that any approval of the application by the Commission should contain carefully worded conditions and, possibly, the permit should be issued for a duration of only one year to determine if any serious problems existed, with a requirement that Mr. Cressotti reapply the following year if he wished to continue the use.
The applicant submitted detailed documentation describing the particulars of the anticipated use, including descriptions of an intended batting cage and pitching machine. The public hearing before the Commission proceeded on May 7, 1992. Mr. Cressotti and a number of others testified; the plaintiff, Mrs. Parakilas, and several other participants voiced their objection to the application. Mr. Cressotti distributed a packet of descriptive materials to Commission members, repeated the dates and times that the proposed use would be operational, confirmed that the intended age levels of the students would range from nine to eighteen years, and identified the location of the batting enclosures, etc. in relation to abutting properties. The applicant projected that traffic would consist of a maximum of thirty cars per day for those weeks specifically designated for the camp, and [would] be less than that for the rest of the time"; he noted the great variety of sports and other activities which took place at the abutting Enfield Street School and, with respect to any inordinate noise, stated:
 "The noise generated from the batting cage and pitching machine equipment, and instruction given in and around the area of the cage, should not be objectionable to anyone. The noise levels of the activities at [the] Enfield Street School . . . far surpass that of a maximum of the students [which] I plan to have at any one time."
Mr. Cressotti further stated that the machines are very quiet, and he testified that the proposed batting cage CT Page 3279 would be seventy feet long, fourteen feet wide and twelve feet high. The cage would be constructed of a steel frame with twine net, so that when the ball was hit, it would land inside the twine netting "offering no noise at all."
When inquired of regarding the overall duration of the school's activity, Mr. Cressotti indicated that it would not be operational on a year-round basis, but "would go from the end of June to the beginning of October."[5] In response to the Chairman's question, the applicant stated the driveway into the property was twenty feet wide and that two cars, traveling in opposite directions, could not pass on the paved portion thereof: "one would have to back out or they would have to drive on the grass." Commissioner Lynch pointed out that based on applicant's projection of thirty cars per day, there would be one hundred-twenty trips in and out of the driveway ("somebody comes in and drops them off, goes home and comes back a couple of hours later — so between ingress and egress, you have 120 trips a day in and out of [the] driveway.").
Several members of the public, including plaintiff, addressed the Commission in opposition to the application. They expressed concerns regarding a devaluation of properties in the immediate area, the hazardous nature of the pitching machines due to speed and inaccuracy, the unsightly appearance of batting cages, traffic backing up to Route 5, and the creation of "a bottleneck" with respect to access for emergency vehicles. One opponent stated: "I think that my biggest objection in allowing this to happen [is that] it is changing the character of the residential neighborhood that it was always intended to be and [which we] are trying to preserve . . ."; another commented: ". . . in due time they will be installing floodlights on that thing and it will look like a major league baseball park." It was also stated: ". . . let's look at what it is doing [;] [t]he prime thing is you are changing the character of neighborhood, you are changing the zoning code . . . and that I am vehemently against." Others favored the application, one expressing the general sentiment, as follows:
 ". . . I have students and children . . . who are very interested in participating in this particular camp and I think it would be a wonderful opportunity for them to be involved in this kind of activity. CT Page 3280 I know Mr. and Mrs. Cressotti . . . this is their home. They take a great deal of pride in it. They have just recently expanded their home and they are not going to deteriorate in any way the value of the neighborhood or allow the value of the neighborhood to go down. I think it is important that there are a number of students within the area who could walk to the facility . . . and I think that it is important for the Board to consider in terms of availability for the students because it is located near the school and because there are a number of students who already walk to Enfield Street School. The location of this camp would be very advantageous to both parents and students during a period of time when numbers of parents both work and transportation for students is really important. I don't think it will create any more noise or havoc in the area than Enfield School does at this time . . ."
Additional discussions were had concerning a foliage screen along the borders of the property, and the fact that the proposed use would not involve more than two employees. (Mr. and Mrs. Cressotti). The Town Planner, in response to questions of Commission members, indicated that if the use permit was granted, reasonable limitations could be imposed, including a time limitation.[6]
On May 8, 1992, Mr. Cressotti was advised by letter of the action taken by the Commission at its May 7 meeting:
 "Special Use Permit Application . . . requesting the use of a baseball school, premises located at 1320 Enfield Street, R-33 and HR-33 zone. Application is made under Section 9-12, 9-1.8 and 16-2.4 of the . . . Ordinance. Approved with the following conditions:
 1. The maximum number of students at any one time is ten (10);
 2. the approval is for two years maximum from the date of approval;
 3. the maximum hours of operation shall be from 9:00 a.m. — 7:00 p.m.; CT Page 3281
 4. this school may only operate between June 1st and October 31st of each year;
 5. no more than two employees shall operate the school, both must reside on the premises."
The Commission's approval was duly published in the Journal Inquirer on May 21, 1992; the instant appeal was filed June 9, 1992 (served June 4, 1992).
I. Aggrievement
Plaintiff has alleged that she is aggrieved by the action of the Commission in that she owns land which abuts the real property involved in the Commission's decision.[7]
At a brief evidentiary proceeding before this court, plaintiff testified that at all relevant times, she has been the owner of property known as 8 Mitchell Drive, Enfield, which property abuts the land which was the subject matter of the Commission's decision. General Statutes 8-8(a)(1) provides, in pertinent part:
 "`Aggrieved person' includes any person owning land that abuts . . . any portion of the land involved in the decision of the board.
Subsection (b) states:
 ". . . any person aggrieved by any decision of the board may take an appeal to the superior court . . . The appeal shall be commenced by service of process . . . within 15 days from the date that notice of the decision was published as required by the general statutes."[8]
Plaintiff has established statutory aggrievement; accordingly, this court has jurisdiction to consider the merits of the instant appeal.
II. Timeliness
On June 4, 1992, plaintiff served the Chairman of the Commission, the town clerk of Enfield, and the defendant, Robert Cressotti. The instant appeal is timely. CT Page 3282
III. Standard of Review
The court's proper function on an appeal from the decision of a local zoning authority is exceedingly limited; it is simply to review the administrative record and decide whether the local authority acted arbitrarily, illegally, or in abuse of its administrative discretion. Whittaker v. Zoning Board of Appeals, 179 Conn. 650, 654 (1980); Tazza v. Planning and Zoning Commission, 164 Conn. 187, 191 (1972). In ruling on an application for a special use permit, a planning and zoning commission acts in an administrative capacity and determines "whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply." Double I Limited Partnership v. Plan and Zoning Commission, 218 Conn. 65, 72 (1991). In reviewing a planning and zoning commission's decision regarding a special permit application, the court is to determine merely whether the action taken was unreasonable, arbitrary, or illegal, considering that in such matters, "the board is endowed with liberal discretion." Id.
Determinations of local zoning authorities are not to be overturned unless it is found that the Commission acted unfairly, without proper motives, and upon invalid reasons. Devaney v. Zoning Board of Appeals, 143 Conn. 322, 325
(1956); Mallory v. West Hartford, 138 Conn. 497, 505 (1952). If, in granting a special permit, a Commission construes a section of the zoning ordinance "beyond the fair import of its language, the [C]ommission [has] acted in an arbitrary and illegal manner." Double I Limited Partnership v. Plan and Zoning Commission, supra at p. 72. "The trial court may not substitute its judgment for the wide and liberal discretion vested in the local authority when acting within its prescribed . . . powers . . . [and] the court may grant relief on appeal only where the local authority has acted illegally or arbitrarily . . ." Frito-Lay, Inc. v. Planning and Zoning Commission, 206 Conn. 554, 572-73 (1988), quoting Raybestos-Manhattan, Inc. v. Planning and Zoning Commission,186 Conn. 466, 469-70 (1982). The conclusions reached by the Commission are to be upheld if they are reasonably supported by the record returned to the court; additionally, it is fundamental that the determination of issues of fact is solely within the province of the administrative tribunal. Burnham v. Planning and Zoning Commission, 189 Conn. 261, CT Page 3283 265 (1983). "The question is not whether the trial court would have reached the same conclusion, but whether the record before the agency supports the decision reached." Id. Since zoning questions involve circumstances and conditions peculiarly within the knowledge of local zoning authorities, the solutions are properly within the province of those local boards; Levinsky v. Zoning Commission,144 Conn. 117 (1965); and, since the local zoning authority is closer to the circumstances and conditions giving rise to the particular question, and which shape its sensible resolution, the local board should be given wide discretion in determining public need and the means of meeting it — the zoning authority's knowledge, familiarity with the situation, and wide discretion should be afforded considerable deference by a reviewing court. Fedorich v. Zoning Board of Appeals,178 Conn. 610, 613-144 (1979).
As stated, the Commission's decision must be reasonably supported in the record. Rocchi v. Zoning Board of Appeals,157 Conn. 106, 110 (1968); Daughters of St. Paul, Inc. v. Zoning Board of Appeals, 17 Conn. App. 53, 68 (1988). Where the zoning authority has stated the reason(s) for its decision, the court should consider only whether the assigned grounds find reasonable support from the established record Fedorich v. Zoning Board of Appeals, supra. "The action of the commission should be sustained if even one of the stated reasons is sufficient to support it." Burnham v. Planning and Zoning Commission, supra at p. 265. If the Commission has failed to give the reason(s) for its action(s), or if its reasons are inadequate, the trial court is required to search the record to determine whether a basis exists for the action taken. A.P. and W. Holding Corporation v. Planning and Zoning Board, 167 Conn. 182, 186 (1974); see also: Gagnon v. Inland Wetlands and Watercourse Commission, 213 Conn. 604,607-08 (1990); Stankiewicz v. Zoning Board of Appeals,15 Conn. App. 729, 732 (1988). And, of course, in this type of proceeding, "`[t]he burden of proof to demonstrate that the board acted improperly is on the plaintiff.'" Adolphson v. Zoning Board of Appeals, 179 Conn. 650, 654 (1980). Where the court finds that the administrative action was illegal, arbitrary, or constituted an abuse of the agency's discretion, the court should sustain the appeal. Frito-Lay, Inc. v. Planning and Zoning Commission, supra; Bogue v. Zoning Board of Appeals, 165 Conn. 749, 756 (1979). CT Page 3284
IV. Merits
The Commission did not articulate specific reasons with respect to the granting of this special use permit; however, it did indicate that the application was submitted (and ostensibly approved) pursuant to Sections 9-1.2, 9-1.8, and16-2.4 of the Zoning Ordinance. In determining whether to grant or deny an application for a special permit, the Commission's proper function is to ascertain whether the proposed use is expressly permitted under the applicable section(s) of the Ordinance. A.P. and W. Holding Corporation v. Planning and Zoning Board, supra at p. 185. And, since the "rules of statutory construction apply to the interpretation of local regulations . . . [w]e look first to the language of the regulation to determine the intent of the enacting body . . . If the language of the regulation is ambiguous, the court can look to its purpose as an aid in construing it." Double I Limited Partnership v. Plan and Zoning Commission, supra at pp. 72-73. "[W]hen the language of a statute [or ordinance] is plain and unambiguous, we need look no further than the words themselves . . ." American Universal Ins. Co. v. Del Greco,205 Conn. 178, 193 (1987). Courts will not ordinarily construe a statute or ordinance when its meaning is plain and unambiguous. Wright v. Commissioner of Corrections,216 Conn. 220, 225 (1990). "The words of a statute [or ordinance] are to be given their commonly approved meaning unless a contrary intent is clearly expressed. . . . In the absence of ambiguity [the] language should be given its plain and ordinary meaning" (Emphasis added). Pintavalle v. Valkanos, 216 Conn. 412, 416-17 (1990).
Section 9-1.2 of the Enfield Zoning Ordinance states that the following uses are permitted in one family residence districts: "Places of worship, public schools and schools operated by religious groups and uses providing essential community services including . . . (b) park, playground or recreation area operated by the Town of Enfield; . . . (d) private schools . . . below junior high school level, whether or not operated for profit . . ." (Emphasis added). The term "junior high school" is defined in Webster's Third New International Dictionary as "a school organized to facilitate the transition from elementary school to high school, usually including the seventh and eighth grades of the elementary school and the first year of the high school CT Page 3285 . . ."; and, in The American Heritage Dictionary of the English Language, New College Edition, the term is defined as a "school in the U.S. system intermediate between grammar school and high school, and generally including the seventh, eighth, and sometimes ninth grades." Based on the aforesaid definitions, it is the court's view that the language of Enfield's Section 9-1.2 plainly and unambiguously refers to levels of schools below the seventh grade. Since the record specifically reveals that the facility would provide instruction to students ranging in age from nine to eighteen, it cannot be brought under Section 9-1.2 as a private school below the junior high level.[9] Therefore, the Commission, improperly, illegally, and arbitrarily granted the application under Section 9-1.2 of the Ordinance. Double I Limited Partnership v. Plan and Zoning Commission, supra.
Section 9-1.8 of the Enfield Zoning Ordinance provides: "Philanthropic, educational, recreational, religious, and eleemosynary uses by a duly incorporated non-profit body or or governmental unit, secondary schools, cemeteries, non-profit clubs, clubs, hospitals, sanitariums, and convalescent homes, may be permitted [in one family residence districts] subject to a Special Use Permit from the Planning and Zoning Commission." (Emphasis added). Plaintiff contends that the meaning of the term "school" is substantially dependent upon the context and purpose of the ordinance in which that word is used; in such regard, she maintains that the purpose of Section 9-1.8 is not to permit schools operated for a profit since most of the special uses permitted by the section are non-profit or charitable uses. While plaintiff's assertions are persuasive, they are not, in the court's view necessarily dispositive; rather, the basic rule of statutory construction pertains; that is, words contained in an enactment "must be construed according to their plain and ordinary meaning." Bratsenis v. Rice, 183 Conn. 7, 10
(1981). The term "secondary school" is defined in Webster's Third New International Dictionary as "a school more advanced in grade than an elementary school and offering general, technical, vocational, or college preparatory courses." In The American Heritage Dictionary of The English Language, New College Edition, the term is defined as "[O]f or relating to education between the elementary school and the college." In the instant case the record discloses that the anticipated use of the Cressotti property would be limited to instruction in skills related solely to baseball; in the court's view, CT Page 3286 the proposed use cannot, on the record established administratively, be reasonably viewed as a facility offering a technical or vocational curriculum, and certainly it would not provide general educational or college preparatory courses. Furthermore, the intended use would entail instruction to students ranging in ages from nine to nineteen; that is, it would include students below the secondary school level (the use would not be limited to students "more advanced in grade than . . . elementary school"). Therefore, the approved facility would not be a "secondary school", and the Commission's granting of the permit application under section 9-1.8 of the Ordinance was improper, illegal, and arbitrary.[10] Double I Limited Partnership v. Plan and Zone Commission, supra.
Section 16-2 of the Enfield Zoning Ordinance sets forth the uses which require Special Permit approval by the Commission; the provisions are essentially identical (and make reference) to Sections 9-1.2 and 9-1.8 of the Ordinance.[11] Therefore, Section16-2.4, which simply allows the approval of special permits under Sections 9-1.2 and 9-1.8, furnishes no independent basis for the issuance of the special permit in this case.
Plaintiff contends that the limiting conditions imposed by the Commission could not validate this special use permit because it authorizes a use not permitted under the applicable sections of the Ordinance, and furthermore, that the said conditions themselves are void since they are not specifically found in the regulations; she argues:
 "Nowhere in the regulations are the imposed conditions cited. Hence, no one can really measure to what good any condition imposed can do. The letter as well as the spirit of the regulation clearly were glossed over." Plaintiff's Brief, 9/17/92, p. 7.
Our Appellate Court has stated: "`The conditions under which a special [permit] is allowed must be found in the regulations and cannot be altered; and if a condition is imposed by a commission without being warranted by the regulations, it is void.'" Michel v. Planning and Zoning Commission, 28 Conn. App. 314, 327 (1992) (citing Beckish v. Planning and Zoning Commission, supra); Hochberg v. Zoning Commission, supra. See also: Service Realty Corporation v. CT Page 3287 Planning and Zoning Board of Appeals, 141 Conn. 632, 636
1954).
Section 16-7 of the Ordinance, entitled "General considerations", provides: "In authorizing any use, the Commission shall take into consideration the public health, safety and general welfare, the comfort and convenience of the public in general, and of the residents of the immediate neighborhood in particular, and may attach reasonable conditions and safeguards as a precondition to its approval." (Emphasis added). This general section directs the Commission to consider certain "general objectives"; one such objective is set forth in Section 16-7.2: "[t]hat the proposed use shall be of such location, size and character that, in general, it will be in harmony with the appropriate and orderly development of the district in which it is proposed to be situated and will not be detrimental to the orderly development of adjacent properties in accordance with the zoning classification of such properties." (Emphasis added). Section 16-8, entitled "Conditions of Approval", requires the Commission to give specific consideration to the following:
 "Section 16-8.4 Character and Appearance: that the character and appearance of the proposed use, buildings, and/or outdoor signs will be in general harmony with the character and appearance of the surrounding neighborhood and that of the Town of Enfield and will not adversely affect the general welfare of the inhabitants of the town of Enfield." (Emphasis added).
It is upon these sections of the Ordinance that the defendant. Commission relies in asserting the validity of the imposed conditions. See: Defendant Enfield Planning and Zoning Commission's Brief, 10/14/92, p. 6-9.
General Statutes Section 8-2 states that zoning regulations may provide "that certain classes or kinds of buildings, structures or uses of land are permitted only after obtaining a special permit . . . from a zoning commission . . . subject to standards set forth in the regulations and to conditions necessary to protect the public health, safety, convenience and property values." (Emphasis added). A zoning commission cannot require an applicant to meet CT Page 3288 conditions which are not contained in the regulations themselves. DeMaria v. Planning and Zoning Commission,159 Conn. 534, 540-41 (1970); Farina v. Zoning Board of Appeals,157 Conn. 420, 422-23 (1969). In Hochberg v. Zoning Commission, supra, the Commission imposed conditions designed to regulate the selling price of condominium units; in establishing such conditions, the zoning body relied on a general provision of the ordinance which was enacted (pursuant to the enabling authority of Section 8-2) to ensure "that structures and the uses of land [were] arranged in a manner that enhance[d] the health, safety, and general welfare" of town residents. The Appellate Court held that such language was "not sufficiently specific" to authorize the imposition of conditions controlling the selling prices of condominium units, and therefore, those conditions were imposed "without being warranted in the zoning regulations." In Parish of St. Andrew's Church v. Zoning Board of Appeals,155 Conn. 350, 352-355 (1967), the condition provided for revocation of approval of special permits upon failure of the landowner to convey a strip of land to the City of Stamford (in the instant case, as stated, the special permit was for a duration of two years, apparently subject to reapplication and/or approval at the end of that period). The portion of the Stamford ordinance relied upon provided that the Board could exercise its powers and duties "subject to appropriate conditions and safeguards, in harmony with the purpose and intent of [the] regulations and in accordance with the public interest and the most appropriate development of the neighborhood." In ruling the condition void, the court observed that the special exception (to operate a gas station on the land) permitted the property owner "to put his property to a use which [was] expressly permitted under the regulations", and, the court repeated the established principle that any condition "under which an exception is permitted must be found in the regulations themselves and cannot be altered". The court then held that the zoning authority "had no authority to impose, as a condition to the use of the property as a gasoline service station, a requirement that the owner convey the strip to the city", and that "[s]o much of the decision as imposed the condition and reserved the right to revoke the permission [was] void and of no force."
The conditions attached to the special permit in the instant case limited the extent of the use, its size (number of CT Page 3289 students), daily hours of operation, the dates or duration of operation, and the number of employees. Such limitations address many of the concerns raised at the public hearing, both by the public and by Commission members. The conditions, unlike those in the Hockberg and Parish of St. Andrew's cases, would, in the court's view, appear to fall within, and be warranted under, the general language and purpose of Sections 16-7 and 16-8 of the Ordinance: "the public health, safety and general welfare, the comfort and convenience of the public . . . and of the residents of the immediate neighborhood"; "be of such location, size and character that . . . it will be in harmony with the appropriate and orderly development of the district. . . ."; and, "will be in . . . harmony with the character and appearance of the surrounding neighborhood . . . and will not adversely affect the general welfare of the inhabitants. . . ." Similarly, the conditions imposed by the Commission are generally consonant with the enabling provisions of General Statutes Section 8-2 since they address, and relate to, certain concerns raised as to traffic generation, traffic back-up onto Route 5, ingress and egress of emergency vehicles, and the appearance and noise levels of this use. The conditions fall within the purview of the statutory language (Section 8-2), and were viewed by the Commission as limitations "necessary to protect the public health, safety, convenience and property values."[12]
The law is clear that even if any one or more of such imposed conditions should be found invalid, that circumstance would not necessarily render the approval of a special use permit illegal, provided, the Commission's determination was otherwise supported by sufficient grounds. Hochberg v. Zoning Commission, 24 Conn. App. supra at p. 530. As stated, a special permit allows the use of an applicant's property which is expressly permitted under the regulations. Beckish v. Planning and Zoning Commission, supra. Here, the use proposed by Mr. Cressotti was not permitted under Sections9-1.2, 9-1.8, or 16-2.4 of the Enfield Zoning Ordinance. Therefore, the improper granting of the special permit was not validated by the imposition of the limiting conditions. See e.g., Michel v. Planning and Zoning Commission, 28 Conn. App. supra at pp. 315-17 (since a restaurant with a drive-through window was unallowable in the present district, a change of zone and the acquisition of a special permit — with a valid condition — was required before a McDonalds with a drive-through facility could be CT Page 3290 constructed).
Conclusion
Based on the court's review of the administrative record, it is concluded that Sections 9-1.2, 9-1.8, and16-2.4 of the Enfield Zoning Ordinance do not authorize the use proposed by Mr. Cressotti for the property known as 1320 Enfield Street, located in single-family residence zones. Therefore, approval by the Commission of the application for a special permit was improper, illegal, and arbitrary. The imposition of seemingly warranted conditions to the granting of the special permit did not render it valid since, as stated, the proposed use was not a permitted one under the sections of the Zoning Ordinance relied upon by the Commission.
For the reasons stated herein, the plaintiff's appeal is Sustained.
Mulcahy, J.