[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. STATEMENT OF THE CASE
Plaintiffs, Louis R. Forsell, Trustee, under declaration of trust dated May 26, 1967, amended September 26, 1990, and Iris I. Forsell, Trustee, under declaration of trust dated May 26, 1967, amended September 26, 1990, are appealing pursuant to General Statutes, Sec. 22a-43 from the decision of the defendant, Conservation Commission of the Town of Redding ("Commission"), denying the plaintiffs' applications for licenses to construct single family homes on two separate lots owned by the plaintiffs.
II. PROCEDURAL HISTORY CT Page 3195
On April 14, 1994, the Commission published its final decision on the plaintiffs' applications in the Redding Pilot. (Return of Record ("ROR"), Item 32.) Pursuant to General Statutes, Sec. 22a-43, the plaintiffs served the Commission on April 21, 1994 by causing a true and attested copy of the complaint and summons to be left in hand with the assistant town clerk, Linda L. Vibbert, who accepted service on behalf of the town clerk, agent for service for the Town of Redding. (Sheriff's Return.) Also, on April 21, 1994, the plaintiffs served the Commission by causing a true and attested copy of the complaint and summons to be left at the usual place of abode of the chairman of the Conservation Commission, David Pattee. (Sheriff's Return.) On April 21, 1994, pursuant to General Statutes, Sec.22a-43(a), the plaintiffs served Timothy Keeney, commissioner of the Department of Environmental Protection of the State of Connecticut ("DEP commissioner"), by causing a true and attested copy of the complaint and summons to be left in the hands of the DEP commissioner. (Sheriff's Return.)
On April 26, 1994, the appeal was filed in the Superior Court, Judicial District of Danbury. The plaintiffs have alleged aggrievement. They also have alleged that the Commission should have granted both applications because neither lot has any wetlands or watercourses and because no wetland or watercourse is close enough to the lots to give the Commission the authority to require that the applications be filed, much less the authority to deny them.
On May 19, 1994, the Commission filed an answer denying that there are no inland wetlands or watercourses on either lot and that neither lot, in any part, lies within a "Regulated Area" as defined by the Inland Wetlands and Watercourses Regulations of the Town of Redding ("regulations"). The answer denied that the Commission's denial was unlawful, illegal, arbitrary, capricious and in abuse of its powers under General Statutes, Secs. 22a-36
to 22a-45.
On July 8, 1994, the Commission filed the Return of Record with the court. The plaintiffs filed a brief on August 10, 1994. The Commission filed a brief on October 7, 1994. A hearing was held before the court on December 5, 1994.
III. FACTS
In deciding the plaintiffs' applications, the Redding CT Page 3196 Conservation Commission acted in its capacity as the Redding Inland Wetlands Agency pursuant to General Statutes, Sec. 22a-42. The subject of the plaintiffs' applications are two lots on Sunnyview Drive in Redding. (ROR, 11.) Lot 7, located at 16 Sunnyview Drive, is 1.18 acres with 125 feet of frontage on Sunnyview Drive. (ROR, 2A.) Lot 45, located at 15 Sunnyview Drive, is 1.227 acres with 125 feet of frontage on Sunnyview Drive. (ROR, 2.) Lot 7 and lot 45 approximately face one another on opposite sides of Sunnyview Drive. (ROR, 11.)
In 1975, Louis A. Forsell, the father of Louis R. Forsell and wife of Iris I. Forsell (Plaintiffs' Brief, p. 8), applied to the Commission to conduct regulated activity on the following seven lots on Sunnyview Drive: 5, 7, 43, 45, 49, and 51. (ROR, 32.) The application was denied in a letter dated August 21, 1975. (ROR, 32.) The reason stated was that "the Commission cannot make the findings required by Section 6.4 of its regulations[1] that the proposed activity does not have a significant impact or major effect on the wetlands or water courses within the area of the proposed activity." (ROR, 32.) Louis A. Forsell was advised, however, that he might "submit a final application." (ROR, 32.) The record does not contain any further documentation of 1975 activities.
Dated October 27, 1993, the inland wetlands and watercourses application forms, number 93-25 for 15 Sunnyview Drive and number 93-26 for 16 Sunnyview Drive, list Louis R. Forsell, Trustee, as the owner of lots 7 and 45 and list Iron Horse Development, Inc. as the applicant/authorized agent. (ROR, 6, 6A.) The title of the project listed on each application is "to construct single family residential dwelling." (ROR, 6, 6A.)
The interdepartmental check-off sheet for zoning permit for each lot lists Iron Horse Development, Inc. as the owner, with Glenn Tatangelo as its agent, of lots 7 and 45. (ROR, 5, 5A.) On these forms, the Planning Commission and Health Department signed off on the application. (ROR, 5, 5A.) In the space for the Conservation Commission's response, someone wrote "needs on site [sic] by enforcement officer and environmental consultant" followed by the initial "JB." (ROR, 5, 5A.)
On November 2, 1993, the Commission held a meeting at which Iron Horse Development, Inc.'s agent, Glenn Tatangelo, presented a letter from certified soil scientist, Marc Beroz, stating first that there are no wetlands on either lot, although there is a CT Page 3197 high water table, and second that no regulated activities are involved in the proposed development. (ROR, 10.) There was a site walk and inspection on November 7, 1993. (ROR, 8.)
There was published notice of a public hearing to be held on the applications on January 4, 1994. (ROR, 18.) There was another notice for a public hearing to be held on January 18, 1994. (ROR, 20.) A letter signed by Louis R. Forsell grants the Commission an extension of time and acknowledges that the public hearing will begin January 18, 1994. (ROR, 21.) The public hearing was continued on February 15, 1994, and March 1, 1994. (ROR, 26, 27.) The Commission held deliberations on March 15, 1994, and April 5, 1994. (ROR, 28, 30A.)
Throughout the process, the plaintiffs maintained that the Commission's regulations should not apply to either lot because there is no wetland on either one and thus there can be no regulated activity, as defined by the Commission's regulations, on either lot. (ROR, 10, 22.) The application is before the Commission "as a matter of courtesy," according to the plaintiffs' engineer. (ROR, 52, Public Hearing, January 18, 1994, p. 3.) According to David Pattee, chairman of the Commission, the application is before the Commission because "I told them to apply]." (ROR, 52, Public Hearing, March 1, 1994, p. 50.)
On April 5, 1994, the Commission voted unanimously to deny plaintiffs' applications. (ROR, 30, 31.) Notice of the denial was published in the Redding Pilot on April 14, 1994. (ROR, 30.) In its letter to Louis R. Forsell, the Commission quoted the following to describe its denial of application 93-25 for lot 45: "[o]n the motion of Mrs. Berger and the second of Mr. Jaslow, it was unanimously voted to deny the application for non-compliance with Sections 7.2(a), 7.3(a) and 7.7 of the Inland Wetlands and Watercourses Regulations of the Town of Redding."[2] (ROR, 31.)
IV. JURISDICTION
A. Aggrievement
The court found aggrievement during the hearing, since no claim was made that the plaintiff was not aggrieved.
B. Timeliness
General Statutes, Sec. 22a-43 states, in pertinent part: CT Page 3198
 [A]ny person aggrieved by any . . . decision . . . made pursuant to sections 22a-36 to 22a-45, inclusive, by the commissioner, district or municipality . . . may, within the time specified in subsection (b) of section 8-8 from the publication of such . . . decision . . . appeal to the superior court for the judicial district where the land affected is located . . . .
(Emphasis added.) General Statutes, Sec. 8-8(b) requires the aggrieved party to commence an appeal by service of process according to section 8-8(e) "by leaving a true and attested copy of the process with, or at the usual place of abode of, the chairman or clerk of the board, and by leaving a true and attested copy with the clerk of the municipality." General Statutes, Sec. 8-8(b) requires that service be made "within fifteen days from the date that the notice of the [commission's] decision was published. . . ."
On April 14, 1994, the Commission published its final decision on the plaintiffs' applications in the Redding Pilot. (ROR, 30B.) On April 21, 1994, the appeal was commenced by service of process on the required parties. The plaintiffs' appeal was served within the fifteen (15) day period required by General Statutes, Sec. 8-8(b) and, therefore, that the appeal is timely.
V. SCOPE OF REVIEW
"The plaintiff's burden, in challenging the action of the agency in denying the application, is to show that the agency acted arbitrarily, illegally or that the decision is not reasonably supported by the evidence. Lovejoy v. Water ResourcesCommission, 165 Conn. 224, 228-29, 332 A.2d 108 (1973)." MadridCorporation v. Inland Wetlands Agency, 25 Conn. App. 446, 449,594 A.2d 1037, cert. denied, 220 Conn. 915, 597 A.2d 334 (1991). In reviewing an administrative agency's decision, the trial court may not substitute its judgment for that of the administrative tribunal. Frito-Lay, Inc. v. Planning Zoning Commission,206 Conn. 554, 572-73, 538 A.2d 1039 (1988). The review of a decision of an inland wetlands commission is limited to the record. Gagnonv. Inland Wetlands Watercourses Commission, 213 Conn. 604, 609,569 A.2d 1094 (1990); Huck v. Inland Wetlands WatercoursesAgency, supra, 539; Madrid Corporation v. Inland Wetlands Agency,
supra, 449. CT Page 3199
The Connecticut Supreme Court has established the proper standard of review for a trial court hearing the appeal of an inland wetlands agency's decision pursuant to General Statutes, Sec. 22a-43.
 The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given. [Citations omitted.] The evidence, however, to support any such reason must be substantial; [t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. [Citations omitted.] . . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . .
 We have said that an administrative agency is not required to believe any witness, even an expert, nor is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair.
(Internal quotation marks omitted.) Huck v. Inland Wetlands Watercourses Agency, supra, 539-42; see also Madrid Corporationv. Inland Wetlands Agency, supra, 448. "Substantial evidence will be found to exist . . . if the record affords a substantial basis from which the fact in issue can reasonably be inferred." MadridCorporation v. Inland Wetlands Agency, supra. "The question is not whether the trial court would have reached the same conclusion, but whether the record before the agency supports the decision reached." DeBeradinis v. Zoning Commission, 228 Conn. 187,198-99, 635 A.2d 1220 (1994) (citing Huck v. Inland Wetlands Watercourses Agency).
Vl. MERITS OF THE APPEAL
The plaintiffs offer several arguments in support of their appeal. First, the plaintiffs argue that the decision that the applications involved regulated activities was not supported by substantial evidence. Second, the plaintiffs argue that the Commission exceeded its authority in denying the applications. Third, the plaintiffs argue that the reasons the Commission cited for its denial of the applications do not pertain to the issue presented by the applications. The plaintiffs contend that the court should enter judgment granting the applications, or, in the CT Page 3200 alternative, declare that no inland wetlands license is required for them to build on the lots.
The Commission argues in response that its decision was supported by substantial evidence; that it had a sufficient basis in regulation 2.21(d) to determine that the proposals included regulated activities; and that the court cannot conclude that applications were not required.
A. The Commission's jurisdiction over the applications.
The plaintiffs allege that the Commission did not have jurisdiction over the applications because "there are no inland wetland soils on either Parcel, there are no watercourses on either Parcel, and no portion of either Parcel lies within a Regulated Area." (Plaintiffs' Complaint, par. 12b.) The plaintiffs argue that there was no substantial evidence to indicate that either lot contains wetland or a watercourse or that any of the proposed activity — a septic system and a house on each lot — is regulated activity under the regulations. (Plaintiffs' Brief, pp. 16-17.)
Regarding jurisdiction, section I of the Commission's regulations is entitled "Title and Authority" with section 1.4 providing that "[t]he Commission shall enforce all provisions of the Inland Wetlands and Watercourses Act and shall issue, issue with modifications, or deny licenses for all regulated activities on inland wetlands and watercourses" pursuant to General Statutes, Secs. 22a-36 to 22a-45." (ROR, 55.)
1. Existence of wetland or a watercourse on lots 7 and 45 and on surrounding lots.
The Commission's regulation, section 2.29 defines wetlands as "land, including submerged land, which consists of any of the soil types designated as poorly drained, very poorly drained, alluvial or flood plain . . . which are generally shown, for informational purposes only, on an area boundary map on file in the Redding Land Use Office. . . . In each instance, however, the actual character of the soil type or types, tested in the field,
shall determine whether the land in question is subject to regulation." (Emphasis added.) (ROR, 55.) The introductory paragraph of section 2.21 repeats the requirement, among others, that wetlands be determined by soil types as determined "by field inspections and testing conducted by a soil scientist. . . ." CT Page 3201 (ROR, 55.) Regulation 2.28 defines watercourse as "rivers, streams, brooks, waterways, lakes, ponds, marshes, swamps, bogs, and all other bodies of water, natural or artificial, vernal or intermittent, public or private, which are contained within, flow through or border upon the Town of Redding, regardless of their soil types." (ROR, 55.)
The Commission received a letter dated August 25, 1993, from Environmental Resource Associates regarding the soil types on lots 7 and 45, among others. (ROR, 35.) The letter states that the assessment was made pursuant to an on site investigation. (ROR, 35.) The author of the letter, Marc B. Beroz, is a certified soil scientist. (ROR, 35, 56.) The letter states that "[t]here are no wetlands on lots 7 and 45." (ROR, 35.) The letter further states, however, that lots 9, 43, and 49 do contain wetland. (ROR, 35.)
The Commission received other evidence on the issue of whether lots 7 and 45 contain wetlands. A letter from Bridgeport Hydraulic Company, dated February 28, 1994, states that there were "approximately twelve inches of snow on the ground" and that "[n]o vegetation normally associated with wetland conditions was observed on either lot. . . ." (ROR, 46.)
The Commission's environmental consultant, Barbara Obeda, said twice that the property, lots 7 and 45, is not technically wetland but that "it's full of water all the time." (ROR, 52, Public Hearing, February 15, 1994, p. 19.) Obeda stated in a report that there was silky dogwood, "a wetland species of plant," on the lots. (ROR, 36.) Her attached description of the plant from a guide from the Connecticut Department of Environmental Protection, Water Resources Unit, reads that silky dogwood grows "in wooded wetlands, as a member of shrub swamps, at the margins of herbaceous wetlands in the shrub border, and can also grow in wet meadows or pastures." (ROR, 36.) Environmental Resource Associates, however, identified this plant as autumn olive. (ROR, 39.)
A report from Jim MacBroom, P.E. (professional engineer) states that "[t]here are no obvious wetland areas and the Soil Scientist has not identified any." (ROR, 37.) His letter also states that there is "a seasonal shallow groundwater level." (ROR, 37.)
The Commission heard testimony at the public hearings from CT Page 3202 residents of Sunnyview Drive regarding water problems on their property — other lots on Sunnyview Drive. (ROR, 22, 26, 27.) The Commission received two letters from residents of Sunnyview Drive describing the water problems on the street. (ROR, 4, 7, 25.) In these letters, the residents complain of standing water on their property, flooding in their basements, runoff, and erosion. (ROR, 4, 7.) One letter included measurements and a diagram showing that the proposal, if executed, would result in "3 houses and 3 septic systems and 3 wells [being] . . . on significantly less than 2 acres of land" despite Redding's current 2 acre zoning laws. (ROR, 25.) This fact was discussed at a public hearing. (ROR, 27.) The Commission also received a petition, signed by thirty-three (33) people, stating, "[w]e would like to express our concerns about the environmental impact of the proposed project. Drainage patterns in the area pose a very serious potential for damage to neighboring properties by surface runoff. We are also concerned that any additional septic systems will endanger subsurface waters and pollute existing domestic wells." (ROR, 9.) The Commission also received pictures showing excess water and flooding on Sunnyview Drive properties. (ROR, 15, 16, 17, 23, 24.)
The plaintiff's engineer, Steve Trinkaus, testified that it is the Town of Redding's responsibility to fix water problems on the street. (ROR, 26.) Trinkaus prepared a map of all the lots on Sunnyview Drive marking a stream through lots 5 and 47 and wetlands in many of the lots but not in either lot 4 or 45. (ROR, 41.)
The soil types, tested in the field, determine whether a lot contains wetlands. (ROR, 55.) The only evidence supported by field testing of soil regarding any lot on Sunnyview Drive was the test submitted by Environmental Resource Associates' certified soil scientist. In making a finding of whether or not lot 7 or 45 contains wetland or a watercourse, reliance on other evidence, such as testimony from neighbors about water problems on other lots on Sunnyview Drive, in the absence of field testing of the soil would be improper. The Commission cannot ignore the only evidence received from a certified soil scientist — that the soil tests reveal that lots 7 and 45 do not contain wetlands. SeeTanner v. Conservation Commission, 15 Conn. App. 336, 341,544 A.2d 258 (1988) (stating that an agency "is not required to believe any of the witnesses, including expert witnesses; [citation omitted]; [but] it must not disregard the only expert evidence available on the issue when the commission members lack CT Page 3203 their own expertise or knowledge." The record contains no evidence that either lot contains a watercourse. There is no substantial evidence in the record to support a finding that either lot 7 or lot 45 contains wetlands or a watercourse.
However, there is substantial and necessary evidence in the record to establish that land near lots 7 and 45 contains wetland; a finding by a certified soil scientist. In addition, the plaintiffs' own map of Sunnyview Drive shows both wetlands and a watercourse on lots in the surrounding area. (ROR, 41.)
2. Whether the proposed construction is a regulated activity.
The plaintiffs argue that the Commission never made a finding that the proposed construction was a regulated activity. (Plaintiffs' Brief, pp. 9-10.) The plaintiffs refer to a portion of the record where the Commission had failed to decide whether the activity proposed was regulated or what the impact might be on the wetlands. (Plaintiffs' Brief, p. 10; ROR, March 1, 1994, p. 52.) During the course of the public hearing, one attendee stated, "I do not understand whether you have decided whether this is a regulated activity or not. There are not regulated activities on the . . . ." (ROR, 52, Public Hearing, March 1, 1994, p. 52, portion of the transcript that reveals that the speaker's sentence is unfinished.) Pattee responded by saying that the Commission was trying "to determine . . . what the impact of this activity will be on the wetlands." (ROR, 52, Public Hearing, March 1, 1994, p. 52.)
Although the plaintiffs do not cite to specific sub-sections of section 2.21, "Regulated Activity," in their brief, their references and the quoted regulatory material concern sections 2.21 (the introductory paragraph), 2.21(a), and 2.21(b). (Plaintiffs' Brief, pp. 15-16; ROR, 55.) Section 2.21 defines a regulated activity as "any operation within, or use of, a Regulated Area involving removal or deposition of material, or any obstruction, construction, alteration or pollution of such Regulated Area." (ROR, 55, p. 4.) This definition mirrors the definition in General Statutes, Sec. 22a-38(13), "any operation within or use of a wetland or watercourse involving removal or deposition of material, or any obstruction, construction, alteration or pollution, of such wetlands or watercourses, but shall not include the specified activities in section 22a-40."
The proposed septic systems are subsurface waste disposal CT Page 3204 systems according to section 2.21(a) and, therefore, that no portion of the septic systems can be within 150 feet of any watercourse or within 50 feet of any wetland. The proposed septic system on lot 7 is more than 160 feet from the nearest wetland or watercourse. (ROR, 41.) The proposed septic system on lot 45 is more than 180 feet from the nearest watercourse and about 145 feet from the nearest wetland.[3] (ROR, 41.) The proposed septic systems do not constitute regulated activities under section 2.21(a).
The proposed houses are structures according to section 2.21(b) and, therefore, no portion of the houses can be within 50 feet of a wetland or watercourse. The proposed house on lot 7 is more than 145 feet from any wetland or watercourse. (ROR, 41.) The proposed house on lot 45 is more than 140 feet from any wetland or watercourse. (ROR, 41.) The proposed houses do not constitute regulated activities under section 2.21(b).
"[A] lay commission acts without substantial evidence, and arbitrarily, when it relies on its own knowledge and experience concerning technically complex issues such as pollution control, in disregard of contrary expert testimony, without affording a timely opportunity for rebuttal of its point of view." Feinson v.Conservation Commission, 180 Conn. 421, 429, 429 A.2d 910 (1980). An agency "is not required to believe any of the witnesses, including expert witnesses; [citation omitted]; [but] it must not disregard the only expert evidence available on the issue when the commission members lack their own expertise or knowledge." (Citations omitted.) Tanner v. Conservation Commission, supra, 341.
There was no substantial evidence to counter the measurements taken by the plaintiffs' engineer. Determining conformance to sections 2.21(a) and 2.21(b) requires measurements and maps and that, without assistance, such determinations are beyond the expertise or knowledge of the commissioners. The Commission was not entitled to ignore the only expert evidence available on the issue of whether the proposed septic systems and houses constitute regulated activities under sections 2.21(a) and 2.21(b). There is no substantial evidence in the record to support a finding that the plaintiffs' applications will entail regulated activity under sections 2.21(a) and 2.21(b).
The Commission emphasizes that the plaintiffs disregarded both its "concern with activities that have any detrimental CT Page 3205 effect on wetlands and watercourses regardless of their location vis-a-vis the proposed activities" and regulation 2.21(d). (Emphasis in original.) (Defendant's Brief, pp. 10-11.) As set forth previously, section 2.21(d) permits the Commission to regulate any activity that will likely have a significant impact on any wetland or watercourse in Redding. (ROR, 55.) The Commission's arguments concerning section 2.21(d) focus on the following: that balancing protection of wetlands and watercourses with the private use of land is for a legislative not judicial concern; that one who asserts that an agency has acted improperly bears the burden of showing the improper action; and that there is record evidence of a watercourse on the plaintiffs' lots. (Defendant's Brief, p. 12.)
In 1981, the Connecticut Supreme Court interpreted one of Redding's regulations, then section 1.9[4] that dealt "with the regulation of activities occurring outside the physical boundaries of wetlands and water courses," and the court determined that the regulation "reasonably implements the statutory authority to effectuate the legislative purpose." Aaronv. Conservation Commission, 183 Conn. 532, 541, 543, 441 A.2d 30
(1981) (allowing setbacks). The Connecticut Supreme Court subsequently has cited Aaron for the proposition that "inland wetland commissions can now exercise jurisdiction outside their jurisdictional boundaries if activities on `unregulated' land would affect wetlands." Ahearn v. Inland Wetlands AgencyConservation Commission, 34 Conn. App. 385, 391, 641 A.2d 812
(1994), citing Aaron v. Conservation Commission, supra, 542-43.
The progeny of Aaron confirm that fulfilling the mission of the Inland Wetlands and Watercourses Act may mean that a commission must assert jurisdiction over activity on non-wetland to protect nearby wetland. Mario v. Town of Fairfield, 217 Conn. 164,171, 585 A.2d 87 (1991); see Lizotte v. ConservationCommission, 216 Conn. 320, 330, 337, 579 A.2d 1044 (1990) (stating that a case-by-case analysis of the effect of proposed activity on land outside a commission's jurisdiction is not required if the risk of detriment to wetlands outweighs the benefit of so proceeding). The plaintiffs argue that Aaron, Mario
and Lizotte "agree that an inland wetlands agency, when adopting its regulations may look at the impact of activities which are conducted outside wetlands and watercourses. However, once an inland wetlands agency has adopted regulations, due process mandates that the agency thereafter abide by those regulations." (Emphasis deleted.) (Plaintiffs' Brief, p. 20.) The plaintiffs' CT Page 3206 argument does ignore the expansive language of section 2.21(d). The court must interpret section 2.21(d) to determine whether the Commission was following section 2.21(d) and Aaron and its progeny, or whether the Commission was acting beyond its authority.
As explained previously in the present appeal, the plaintiffs' applications are before the Commission either as a courtesy, according to the plaintiffs, or because the Commission's president Pattee "told them they had to come before us." (ROR, 52, Public Hearing, January 18, 1994, p. 3; 52, Public Hearing, March 1, 1994, p. 50.) Louis A. Forsell's 1975 application to conduct regulated activity on seven lots on Sunnyview Drive was denied in 1975; Pattee was concerned about the effect of the 1975 denial on the current applications. (ROR, 52, Public Hearing, March 1, 1994, p. 50; 32.) The letter cited section 6.4 of the regulations in place in 1975 as the reason for the Commission's denial. The version of section 6.4, as it existed in 1975, is not contained in the record, and that the 1975 letter does not make any distinctions between the lots. (ROR, 32.) Therefore, this letter does not reveal the Commission's reasons behind its 1975 decision.
B. Substantial evidence to support a significant impact.
In the present appeal, the Commission's letter denying the plaintiff, Louis R. Forsell's application 93-25 stated that application 93-25 did not comply with three regulations from the "Considerations for Decisions" section of the regulations: sections 7.2(a), 7.3(a) and 7.7. (ROR, 31, 55.)
Section 7.2, entitled General Criteria, contains section 7.2 (a). (ROR, 55.) Section 7.2(a) states that consideration should be given to "[t]he alternatives to the proposed action, including a consideration of alternatives which might enhance environmental quality, or have a less detrimental effect, and which could feasibly attain the basic objectives of the proposed activity. This should include, but is not limited to, the alternative of requiring actions of a different nature which would provide similar benefits with different environmental impacts, such as using a different location for the activity or changing the intensity and/or magnitude of the activity." (ROR, 55.)
Section 7.3, entitled Detailed Parameters, contains section 7.3(a). (ROR, 55.) Section 7.3(a) states that consideration CT Page 3207 should be given to "[t]he ability of the area, in which the regulated activity occurs, to continue to absorb, store or purify water or to prevent flooding, and the projected effect on the water table and drainage patterns." (ROR, 55.)
Section 7.7 states that "[i]n the case of any application which received a Public Hearing, a license shall not be issued unless the Commission finds that a feasible and prudent alternative does not exist. In making this finding, the Commission shall consider the criteria and parameters set forth in this Section. This finding and the reasons therefore shall be stated in the record of the decision by the Commission." (ROR, 55.)
The environmental consultant, Obeda, and the professional engineer, MacBroom, investigated nitrogen levels in the soil. (ROR, 44, 45, 45A.) The required limit of nitrogen is 10 milligram per liter of rainfall within the zone of influence. (ROR, 44, 45.) Obeda states that Trinkaus' use of 60 percent as his rainfall infiltration rate; (ROR, 43A); was too high, based on "the homeowner's pictures and reports at the Public Hearings." (ROR, 44.) In her opinion, based on "observations over the years, and from neighbors comments" that 20 percent to 30 percent is the correct rate. (ROR, 44.) MacBroom suggests 40 percent for the infiltration rate. (ROR, 45.) MacBroom based his 40 percent figure on two U.S. Geological Survey publications[5] describing Connecticut's groundwater recharge rates. (ROR, 45A.)
At 60 percent, the figures are 7.3 mg/1 and 7.2 mg/1 for lots 45 and 7 respectively. (ROR, 44.) Regarding Obeda's estimations, at 30 percent, the figures are 11.2 mg/1 and 11.01 mg/1 respectively; at 20 percent, the figures are 13.62 mg/1 and 13.5 mg/1, respectively. (ROR, 44.) Regarding MacBroom's estimations, according to Obeda's calculations the figures are 9.51 mg/1 and 9.39 mg/1, respectively, and according to his statement the result is beneath the 10.0 mg/1 limit. (ROR, 44, 45.)
In his memorandum, MacBroom offers, "I believe there is a significant probability that the proposed sewage disposal systems would degrade water quality and/or have hydraulic failures." (ROR, 45.) After the Commission requested that the plaintiffs' engineer, Trinkaus, submit proof that the sewage systems would comply with new state guidelines, MacBroom submitted a two sentence memorandum affirming that "the [sewage] leach field length complies with the [new] Public Health CT Page 3208 Code." (ROR, 48.)
The Commission enumerated each regulation specified in its denial letter to Louis R. Forsell during its deliberations. (ROR, 52, Deliberation, March 15, 1994, p. 58; 52, Deliberation April 5, 1994, pp. 63-64.) The Commission also discussed the subject matter of the enumerated regulations without mentioning them by section. (ROR, 52, Deliberation, March 15, 1994, p. 60.)
During the Commission's deliberations, Commissioner Jaslow stated, "[D]o we have enough grounds [to deny the application]? Well, you know, it was also brought up possible impact on wetlands given the situation — if it were exacerbated with additional homes, and I think that's a bona fide reason as well." (ROR, 52, Deliberation, April 5, 1994, p. 62.)
Regarding the requirement of section 7.2(a), that the Commission shall consider alternatives, Pattee questioned whether re-routing the curtain drain would prevent the discharge from exacerbating water problems on other lots. (ROR, 52, Deliberation, March 15, 1994, p. 60.) He said that the re-routing would "help the area where the septic system's going to go [but] certainly isn't going to do anything to help the downstream problem." (ROR, 52, Deliberation, March 15, 1994, p. 57.) Commissioner DeMasi spoke next that "you have to be — the neighbors — those pictures and stuff they showed us were just unbelievable." (ROR, 52, Deliberation, March 15, 1994, p. 57.) This alternative was never resolved. (ROR, 52, Deliberation, March 15, 1994, p. 61.) Pattee later stated that despite section 7.2(a)'s requirement that the Commission consider alternatives, each application "was an offer to build a house on each lot with no other alternatives being given to us" so that section 7.2(a) was not followed. (ROR, 52, Deliberation, April 5, 1994, p. 63.)
After paraphrasing section 7.3(a) for the other commissioners, Pattee criticized the applications for not addressing the neighbors' concerns about the "existing drainage problem and the water table — high water table." (ROR, 52, Deliberation, April 5, 1994, pp. 63-64.)
Regarding section 7.7, Pattee said, "I think that there are probably some engineering alternatives that might cost more money but there are some that are probably available and should be investigated if the applicant wants to build two houses on these pieces of property." (ROR, 52, Deliberation, April 5, 1994, p. CT Page 3209 64.) No finding was made that a "feasible and prudent alternative does not exist" and, therefore, no reasons for this finding were "stated in the record of the decision by the Commission" with respect to the requirements of section 7.7. (ROR, 55.)
The Commission also received evidence that describes the potential impact of the proposed septic systems and houses for lots 7 and 45.
The commissioners further commented on the applications as follows. Commissioner DeMasi stated that "although it's not maybe wetlands per se there are characteristics here that are problematical and lead to a lot of runoff and water flow and stuff. So I don't really know. I'm very sympathetic towards the neighbors' problems because they could really have a resulting problem as a result of this urban development." (ROR, 52, Deliberation, March 15, 1994, p. 57.) Commissioner Jaslow followed with, "[T]hey've gone to great lengths to make sure that everything conforms and it's not that I have a problem with. I just have a hard time consenting to something that you know has a great potential to exacerbate an already pretty lousy situation here." (ROR, 52, Deliberation, March 15, 1994, p. 57.) Commissioner DeMasi countered with, "Well, you have to be — the neighbors those pictures and stuff they showed us were just unbelievable" and "it's seems common sense is that we are supposed to look out for the welfare of the people living in this Town already." (ROR, 52, Deliberation, March 15, 1994, pp. 57, 58.) Commissioners Jaslow and Berger stated that "drainage problems to other properties," were their reason for not approving the applications. (ROR, 52, Deliberation, April 5, 1994, p. 62.)
The court must decide if the record contains substantial evidence in support of finding a significant impact on the wetlands and watercourses of Redding. See Huck v. Inland Wetlands Watercourses Agency, supra, 540-41 (stating not only that an administrative agency must have a reason for its decision but also that it must be supported by substantial evidence); see alsoMadrid Corporation v. Inland Wetlands Agency, supra, (stating that "[i]f none of the reasons given is properly supported by substantial evidence, then the [agency's] decision must be overturned."
VII. CONCLUSION CT Page 3210
The record does not support a finding of significant impact on the wetlands and watercourses of Redding. Accordingly, the matter is remanded to the Commission, to either approve the application or to have further hearings on the matter.
Mihalakos, J.